[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 29, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-14941

_____

D. C. Docket No. 93-01057-CV-J-20

WILLIAM T. TURNER,

Petitioner-Appellant,

versus

JAMES CROSBY, Secretary,
Florida Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 29, 2003)

Before CARNES, HULL and MARCUS, Circuit Judges.

HULL, Circuit Judge:

William Thaddeus Turner appeals the district court's denial of his 28 U.S.C.

§ 2254 petition challenging his death sentence. Turner argues that his attorneys

rendered ineffective assistance of counsel by failing to introduce certain mitigating

evidence during the penalty phase of his trial and that his death sentence violates his constitutional right to a jury trial as established in <u>Ring v. Arizona</u>, 536 U.S. 584, 122 S. Ct. 2428 (2002). After review and oral argument, we affirm Turner's sentence.

## I. BACKGROUND

### A. Turner Murders his Wife and Joyce Brown

The facts concerning the two murders largely are undisputed. In 1969, Turner married Shirley Hart, a victim in this case, and for more than ten years, they had a loving, harmonious marriage. By 1983, however, their marriage had deteriorated. In February 1984, Shirley decided to leave Turner and take their two young daughters, seven-year old Anetra and five-year old Anita, with her. Shirley and the daughters moved in with Joyce Brown, the other victim in this case, and Joyce's fifteen-year old daughter, Irene Hall.[1]

Turner responded to the separation by spying on Shirley with binoculars, watching Joyce's house, and peeping into the windows of Joyce's apartment. Turner repeatedly arrived at Joyce's apartment asking to speak to his estranged

---

[1]Irene Hall also went by the nickname "Faye" and was referred to at trial by both names interchangeably. For purposes of clarity, we will refer to her as Irene and will alter any quotations accordingly. In addition, although the record indicates that both Anita and Anetra moved with their mother, it is clear from the record that Anita was not present at the apartment the morning of the murders.

2

wife, but Shirley refused to see or talk to him. Joyce informed Turner on several occasions that Shirley did not want to talk to him.[2]

During visits to Joyce's house, Turner threatened to kill both Shirley and Joyce and blamed Joyce for the disintegration of his family. Turner believed that his wife and Joyce were lesbians and prostitutes, who sold drugs and participated in illicit behavior in the presence of his daughters, especially seven-year old Anetra.

At approximately 6:30 a.m. on July 3, 1984, Turner walked to Joyce's apartment. Turner was armed with a large knife and his father's single-shot shotgun, which he obtained without his father's permission. While kneeling on the sidewalk in front of the apartment building, Turner fired the shotgun two or three times into the building, shooting directly into the front door and windows and reloading after each shot.

At trial, Irene testified that she heard the shots and that Shirley ran into Irene's bedroom and "ask[ed] her how to lock the door." Anetra also was present in Irene's bedroom. Shirley was unable to lock the door, and Turner entered the bedroom carrying the shotgun and the knife. While Irene hid under the bed, Turner pushed Shirley onto the floor, where he stabbed her approximately twenty-

---

[2]At the time of these incidents, Turner was subject to a court restraining order forbidding him to have contact with either his wife or his daughters. The restraining order stemmed from Turner's prior violent conduct toward Shirley, including two prior incidents of battery.

two times in the presence of fifteen-year old Irene and seven-year old Anetra. According to the two girls, Turner repeatedly cursed at Shirley as he continually stabbed her, saying: "bitch, I hate you;" "I'm sick and tired of you;" "you won't let me see my kids;" and "[y]ou're the bitch I want."

Anetra attempted to save her mother by beating on her father's back and telling him to stop. Anetra ran out of the room when she heard Joyce call for her. Turner did not say anything to Anetra or Irene and did not react to anything the children said or did. Irene remained under the bed while Turner continued to stab Shirley to death.

After stabbing Shirley, Turner left the apartment building and went to the telephone booth where Joyce was on the phone with the police.[3] As approximately forty people watched, Turner stabbed Joyce repeatedly. Turner pulled Joyce out of the telephone booth by her hair and continued to stab her as she lay on the ground. Joyce's daughter, Irene, approached a neighbor, handed him a shotgun, and begged the neighbor to shoot Turner. The shotgun, however, was empty; so the neighbor threw rocks at Turner in an attempt to stop the stabbing. Joyce begged Turner not to kill her, but Turner replied, "no, you're the one who kept my family away from me."

---

[3]Apparently, there was no phone inside the apartment. The telephone booth was located on a busy street corner, only a few houses away from the apartment building.

The record is in dispute regarding whether Turner ceased stabbing Joyce when a police car passed by the telephone booth. Two witnesses testified that Turner continuously stabbed Joyce despite the fact that a police officer drove by and failed to stop to assist. In contrast, another witness testified that Turner stabbed Joyce a number of times until a police car drove by, and Turner "stood up in a correct position and pretended that there wasn't anything going on." According to this witness, after the police car drove by, Turner started to stab Joyce again. In addition, daughter Irene testified that Turner stabbed her mother, retreated behind a house until the police car passed by the scene, and then returned to the telephone booth to continue the stabbing.

Officers John Venosh, Carlton Aikens, and E.L. MacDonald of the Jacksonville Sheriff's Office arrived at the scene shortly after the murders. Turner fled down an alley, and the police officers chased him. According to Officer Venosh, Turner stopped, raised his hands while keeping a knife in his right hand, and then took a step toward the officer. After a momentary standoff, Turner dropped the knife and surrendered to the officers. Officer Venosh testified that Turner immediately stated, "please don't kill me, please don't kill me." As Turner and the officers walked to the patrol car, Turner remarked, "She was f--king up my family, she was f--king up my life." Officer MacDonald described Turner as quiet and not hysterical, noting that Turner "appeared to be in control of himself."

Turner was charged with two counts of first-degree murder for the deaths of Shirley Turner and Joyce Brown.

## B. State's Evidence in Guilt Phase

Turner's murder trial began more than a year later on August 13, 1985.[4] Although what happened during the murders is largely undisputed, we recount in detail certain testimony that relates to the issues on appeal. During the guilt phase, the State first called James Edward Andrews, Joyce's neighbor and an eyewitness to her murder. Andrews testified that on the morning of July 3, he "heard two shots[,] . . . ran on the front porch," and saw Turner fire a third shot from in front of Joyce's apartment building, handling the shotgun "like a professional." Andrews then returned to the inside of his house to call the police and upon returning outside saw Joyce "running to the telephone booth." Andrews testified that Turner "opened the telephone booth door and . . . stabbed her several times," and then he "pulled her out of the telephone booth on the left-hand side and he got down on her and stabbed her several more times." According to Andrews, Turner stabbed Joyce "[b]etween 40 and 45" times. At one point, Turner stopped the stabbing, and, as a police car drove by, Turner "stood up in a correct position and pretended there wasn't anything going on." Andrews also testified that Turner did

---

[4]Turner was represented at trial by two attorneys, Henry Coxe, III, and Daniel Smith. We refer to them collectively throughout this opinion as "trial counsel."

not respond in any way when seven other bystanders yelled and threw bricks and other debris at Turner.

Regarding Turner's behavior prior to the murders, Andrews testified that he had seen Turner approximately "eight times" spying on the apartment building where Turner's wife and Joyce resided, including "a few times with binoculars." Andrews heard Turner threaten to kill Shirley, Joyce, and another neighbor, Daniel Robinson.

The State then called Daniel Robinson who testified that he heard the shotgun blasts and ran out the back door of his apartment building. When Robinson got to the front of the building, "Mr. Turner was coming out [of] the house with blood all over him and he had a knife in his hand." Robinson testified that Turner then ran "down to the telephone booth and grabbed Joyce and was cutting on Joyce." According to Robinson, Joyce's daughter, Irene, came to him "with a shotgun and she handed the shotgun to [him] and she kept hollering . . . stop Mr. Turner, don't let Mr. Turner kill my mother, please stop him." The shotgun, however, was empty, so Robinson threw rocks at Turner but "he just kept on stabbing her." Robinson also testified that Turner did not stop stabbing Joyce when the police drove by and that "he could tell [Turner] was mad because he was slobbering all out of the mouth" while he stabbed Joyce. Robinson stated that approximately forty people witnessed Turner stabbing Joyce.

7

Robinson testified that prior to the date of the murders, Turner was in the neighborhood "everyday . . . [p]eeping and . . . harassing" Shirley and Joyce. On a prior occasion, Turner threatened to kill him, Joyce, and Shirley. Robinson further testified that Turner's spying, including watching the apartment with binoculars, had been occurring for four or five months and that Turner moved into a boarding house one block away from Joyce's apartment.

The State then called two officers from the Sheriff's Office in Jacksonville. Officer MacDonald responded to the call for help near Joyce's apartment complex and testified about Turner's demeanor and condition upon arrest. According to MacDonald, Turner's "hands were cut" and "soaked in blood," and "[h]e appeared to be in control of himself. He wasn't hysterical . . . just quiet." Officer L.M. Burton, an evidence technician, testified extensively about the physical evidence, photographs, and diagrams that he gathered at the crime scene. The evidence included Turner's knife and shotgun; photographs of the victims, the phone booth, and the damage inflicted by the shotgun blasts to the front door and windows of the apartment; and diagrams of the apartment where Shirley and Joyce lived and the surrounding neighborhood.

The State then elicited expert testimony from Dr. Bonofacio Floro, a forensic pathologist and Deputy Medical Examiner for the City of Jacksonville. Dr. Floro performed autopsies on both Shirley and Joyce. Using photographs, Dr.

8

Floro described the wounds of both victims. Dr. Floro testified that these wounds were "caused by a sharp instrument" and that the knife in evidence was consistent with the type of injuries suffered by Joyce.

Dr. Floro explained that there were seventeen stab wounds on the left side of Joyce's chest, including five that "went through the chest wall thickness going into the heart or left lung." The four stab wounds on the right side of Joyce's chest included a "large stab wound . . . with the lungs sticking out from the wound itself." He testified that "three of the[] four [wounds on the right side] would have been fatal" and "five of the[] 17 [wounds on the left side] would have been fatal." According to Dr. Floro, certain stab wounds on Joyce's abdomen, ribs, and back would have been fatal. Dr. Floro concluded that Joyce had fifty-one total stab wounds and that she "died as a result of multiple stab wounds of the body, chest and abdomen."

Dr. Floro further testified that Shirley suffered four stab wounds to the neck, one of which "severed the right carotid artery" and "would have been fatal." There were twelve stab wounds on Shirley's chest. He concluded that Shirley "died of multiple stab wounds of the neck and chest."

The State then called Cynthia Dawson, one of Joyce's daughters. Cynthia testified that she did not live with Joyce, but that her younger sister, Irene Hall, lived with Joyce, Shirley, Anetra, and Joyce's fianceé. Several times when

9

Cynthia visited her mother, Turner appeared outside Joyce's apartment asking to speak with Shirley, but Shirley never went outside. Joyce would tell Turner to leave, and Cynthia testified that Turner came over ten or eleven times in the months leading up to the murders and that he made threatening remarks to Joyce about her relationship with Shirley. Turner called them "lesbians" on two occasions, "bitches" on another, and said that they were not "going to live to tell anybody about how Shirley had left him." On at least one instance, Cynthia saw him watching the house.

Irene Hall, Joyce's fifteen-year old daughter, then testified. Irene and Anetra shared a bedroom, and Shirley had a bedroom all to herself. Irene testified regarding the murders and how she tried to save her mother, as follows:

> I was in the room laying down and I heard a gunshot. . . . Shirley she came running back there, she was asking me how to lock the door and I told her to push the knob down. . . . [S]he was trying to push the knob down and the next thing I know, I saw William Turner come in the room and he pushed her down on the floor and I jumped under the bed. . . . [W]hen I jumped under the bed I had stayed [sic] under the bed and the only thing I heard was him when he was cussing Shirley, he was saying . . . bitch, I hate you, and he was telling her, I am tired of you, I'm sick and tired of you and you won't let me see my kids and I was laying up there under the bed while he was killing–stabbing Shirley. . . .

> Anetra . . . she was sitting over by the bed first. Then she jumped up and she was jumping up, telling Mr. Turner to stop it, stop it, leave her mama alone and he wouldn't leave her mother along [sic], so she ran outside. . . I waited for awhile and I came from under the bed and when I came from under the bed, I didn't see him in there, so I cut on another light and when I cut on the light I saw

> Shirley laying on the floor dead and I screamed and when I screamed, I thought about my mother so I ran, and I ran outside and I went on the porch and next thing I know, I saw him pulling my mother out the phone booth by her hair. . . . [W]hen I saw him pull my mother, I ran back in the house and I got the gun and then I ran back outside and then I had a gun, I was fixing to run over there to try to shoot him, but I couldn't pull the trigger.

According to Irene, Turner stopped stabbing Joyce, ran "back behind the third house" when the police drove by, and, after the police were gone, Turner resumed stabbing Joyce. Irene also testified that Turner did not respond to either his daughter Anetra's screaming at him or hitting him while he was stabbing Shirley or bystander Robinson's throwing rocks and bricks at Turner while he was stabbing Joyce. Irene saw Turner around the outside of the apartment on prior occasions, but never with binoculars.

The State then called Anetra Turner to testify. Anetra lived with Shirley at Joyce's apartment and shared a bedroom with Irene. On the morning of the murders, her father showed up at 6:00 a.m. and began shooting through the door. According to Anetra, her mother ran back into the bedroom, and Turner came into the room and "started stabbing her." Anetra "got off the floor and started beating him on the back" but he kept stabbing Shirley, stating "[y]ou're the bitch I want." Anetra testified that despite her hitting and yelling at her father, he did not respond at all.

11

Anetra also ran outside to the telephone booth where Joyce was calling the police. Anetra testified that she and Joyce saw Turner coming toward the phone booth and that Joyce said, "Please don't kill me." Turner responded, "No, you're the one who kept my family away from me." At that point Anetra ran away down the street. When she returned, Turner was "getting into the police car."

The State then called Officer John Venosh, who was involved in Turner's arrest. Upon arriving at the crime scene, Venosh saw Turner flee and began chasing him. Turner ran behind some of the houses, and Venosh was yelling at Turner to stop running. Turner did stop running, turned around, and "stood completely up with his left hand over his head and his left hand was closed and in his right hand he had a knife." At this point, Venosh told Turner to drop the knife or he would kill him. Venosh testified that Turner took a "step and a half" toward him and then dropped the knife. Turner then stated, "please don't kill me, please don't kill me." Venosh handcuffed Turner with the assistance of Reserve Officer Carlton Aikens and escorted him to the patrol car. Venosh testified that en route, Turner said, "She was f--king up my family, she was f--king up my life."

Officer Sanford Leigh then testified to authenticate a 911 telephone call made by Joyce from the telephone booth on the morning of the murders. Officer Leigh was responsible for fielding incoming distress calls to the Sheriff's Office in

Jacksonville.  The trial court admitted the 911 tape and played it for the jury.  The

tape recorded Turner's accusations at Joyce as he stabbed her, as follows:

Joyce:      William please don't hurt me!  [Screams.]
Turner:     You're the one I want.  You're the one.
Joyce:      [Screams.]
Turner:      You're the one.
Joyce:      [Screams.]
Turner:     You're the one.
Joyce:      [Screams.]  I didn't do nothin', William.  I didn't do nothin'.  I
            didn't do nothin'.  [Screams.]  I didn't do nothin', William.
Turner:     Yes you did.
Joyce:      I didn't do nothin'.
Turner:     Yes you did.
Joyce:      I didn't do nothin'.
Turner:     Yes you did.
Joyce:      I didn't do nothin'.
Turner:     Yes you did.
Joyce:      I didn't do nothin'.
Turner:     Yes you did.
Joyce:      I swear.
Turner:     Yes you did.
Joyce:      I swear William.  William, I swear I didn't do nothin'.
Turner:     Yes you did.
Joyce:      [Unintelligible]
Turner:     No you didn't.
Joyce:      [Screams.]
Turner:     Yes you did.[5]

After this evidence, the State rested.  Turner's counsel, Mr. Coxe, then

moved for a judgment of acquittal on Turner's behalf "as to each of the two counts

in the indictment on the basis that the evidence received in the light most

_____

[5]In his direct appeal to the Florida Supreme Court, Turner challenged the admissibility of
the 911 tape.  Turner v. State, 530 So. 2d 45, 50 (Fla. 1988).  The Florida Supreme Court
concluded that the tape was admissible as "relevant to premeditation," and that the trial court did
not abuse its discretion in admitting the tape.  Id.

favorable to the state cannot support a verdict as charged on either count in the indictment" and that the "highest offense proven at most would be murder in the second degree." The trial court denied the defense's motion for acquittal.

## C. Defendant's Evidence in Guilt Phase

Turner first called Officer Carlton Aikens. On the morning of the murders, Aikens was in the patrol car with Officer MacDonald. When Aikens arrived on the scene, he saw Joyce "laying down on the ground, badly bleeding, bones from her body penetrating her skin." Aikens ran behind Officer Venosh in pursuit of Turner. He testified that Officer Venosh told Turner to drop the knife, but that Turner responded "go ahead and kill me, go ahead and kill me, it's not worth living for,"[6] although he also testified that Turner's demeanor was "normal." According to Aikens, Turner dropped his knife and complied with Officer Venosh's commands to get on the ground. Aikens then handcuffed Turner.

The defense then called William White, the Chief Assistant Public Defender in the Florida judicial circuit that includes Jacksonville. White testified that Officer Venosh told him about his encounter with Turner the day of the murders. White said that Officer Venosh had described Turner as "in a very agitated state" and as "growling and gnashing his teeth."

---

[6]This testimony is in conflict with that of Officer Venosh.

14

The defense's next witnesses were Stephen Rayfield and Ernest Killian, both Special Agents with the Federal Bureau of Investigation. Each testified that they met with Turner as a possible source of information regarding alleged criminal activity by Shirley and Joyce. Rayfield testified that they decided not to use Turner as an informant because (1) he did not have enough useful information and (2) "he seemed to be totally preoccupied with . . . the relationship with his wife, his entire domestic relationship . . . he was just too totally preoccupied." Rayfield also said that Turner "maintained an even disposition throughout the interview, although [Turner] was high-strung." Killian also testified that Turner "seemed to have an emotional preoccupation with his family situation . . . during the time of the interview, he consistently was speaking about his poor domestic situation." Like Rayfield, however, Killian also testified that Turner was "[c]oherent and lucid" and seemed to be a normal person.

The defense then called Detective John Zipperer of the Sheriff's Office in Jacksonville. Zipperer encountered Turner four times before the murders. He testified that Turner did not exhibit any bizzare behavior in his presence and that Turner appeared "quite normal."

The next witness, Russell Kimball, was an eyewitness to the stabbing of Joyce. Kimball testified that Turner did not respond to people throwing rocks at him, that Turner "wasn't concerned" with any of the onlookers, and that Turner

did not stop stabbing Joyce even as the police cars drove by. According to Kimball, after Turner was in the police car he looked "like as if nothing had happened, wondered what the heck was going on" and Turner "had no kind of emotion about him[self] at all."

The defense then elicited testimony from Dr. Daniel Stinson, a licensed psychiatrist, about Turner's mental health. On three separate occassions, Dr. Stinson met with Turner to determine whether Turner "was insane or sane at the time of the murders committed on July 3, 1984." Dr. Stinson testified that Turner "seemed to come from a close family" and that Turner's "Catholic religion seemed to be important to him." Dr. Stinson explained that Turner was the oldest of six children and that Turner stated that "his father and mother were everything parents should be, that he was disciplined with a belt, but that he did not discipline his children with a belt." Turner stated that he and his family "were devout Catholics." Dr. Stinson testified that Turner "was a graduate of high school and . . . had approximately two years of junior college and then . . . some training in electricity."

Regarding Turner's service in Vietnam, Dr. Stinson testified that Turner "was in the military, had served in Viet Nam, had served in some combat, had at one time achieved the rank of sergeant, had gotten in some difficulty and lost a stripe and had an honorable discharge." Regarding Turner's present employment

16

with the DOT, Dr. Stinson said that Turner "liked his job . . . . He thought he was doing well in it . . . [and] he had gotten a commendation . . . sometime in the past year for helping some lady out of some trouble."

Turner informed Dr. Stinson that he was "very close to his family, his children." Dr. Stinson testified that Turner's marriage began to deteriorate in 1982. As part of this marital discord, Dr. Stinson noted that Shirley "had passed some bad checks" and "had called the police on [Turner] when he felt that he had done nothing" to justify calling the police. Dr. Stinson characterized the relationship between Turner and his wife as "hostile-dependant," where "a person . . . is very dependent on the other person and at the same time a lot of hostility is engendered by the very dependency."

Consistent with this hostility, Dr. Stinson testified that Turner was subject to a court restraining order, which provided that Turner "shall have no contact" with Shirley or their children and that Turner "shall not harass, threaten or intimidate" Shirley or their children. Turner also told Dr. Stinson that "he slapped or pushed his wife around a bit," although he "claimed that he had not actually hit her as [in] hitting her with a fist and did not hurt her." By February 1984, "their relationship really deteriorated," and Shirley left Turner. Turner told Dr. Stinson that his wife was working as a prostitute and "talking about lesbian relationships" about the time that she left him.

17

Dr. Stinson further testified that Turner tried to persuade Shirley to come back to him "through talking to her, contacting her, [and] calling her." Turner also informed Dr. Stinson that Shirley "tried to have him Baker [A]cted," which is "a commitment procedure through which people may be committed if they refuse voluntary treatment and are either dangerous to themselves or others."[7] After a physical altercation with his wife, Turner was taken to a local hospital that acted as the receiving center for all Baker Act patients. Turner told Dr. Stinson that he was "kept for 45 minutes for an evaluation by the psychiatric evaluator and released."

Turner also indicated to Dr. Stinson that Shirley had moved in with "her lesbian friend and pimp." Turner told Dr. Stinson that his daughter Anetra informed him of sexual behavior at the house. Turner admitted to Dr. Stinson "to having gone by the house several times and hearing various goings-on in the house, which he presumed to be times of sexual orgy. He may have even looked through the window prior to the time of the murder."

Regarding the murders, Turner told Dr. Stinson that he "didn't remember very much at all about it." Dr. Stinson ultimately diagnosed Turner as suffering from a "dissociative reaction," which he described as a "type of amnesia." Dr.

_____

[7]Florida Statute § 394.467, known as the Baker Act, allows a person to be placed involuntarily in a treatment facility if clear and convincing evidence indicates that the person is mentally ill, and, inter alia, there is a substantial likelihood that, based on recent behavior, the person will inflict serious bodily harm on himself or another person. Fla. Stat. § 394.467(1)(a).

18

Stinson based his diagnosis in large part on Turner remembering that, during the stabbing, his wife had "no face."

Dr. Stinson testified that Turner also said that he saw Shirley "having intercourse with another man" the night before the murders. Dr. Stinson opined that this event "is when [Turner] really became psychotic and the psychotic process started and culminated with the events of the murders." Dr. Stinson stated that "people, even who are psychotic, still have the same normal defenses left and you can appeal to them at some normal level," and that such responsiveness could explain Turner's compliance with police commands.

Dr. Stinson also explained that Turner suffered from "a brief psychotic episode or reaction" and that Turner was legally insane at the time of the murders. According to Dr. Stinson, such a diagnosis would be accurate even if Turner had stopped stabbing Joyce as the police drove by. Dr. Stinson further concluded that during the course of the murders, Turner "was not able to reason accurately and that he was not in control of his faculties." Dr. Stinson described Turner as "delusional," but also "that at some level Mr. Turner knew what he was doing." Dr. Stinson opined, however, that Turner did know the consequences of his actions and that Turner "may well have thought that he was right in what he was doing, that he did not believe he was wrong." Consistent with such an opinion, Dr. Stinson stated that Turner "was without remorse. . . . [Turner] felt that if he

had it all to do over again, he probably would." After Dr. Stinson's testimony, the defense rested.

## D. State's Rebuttal Witnesses in Guilt Phase

For its first rebuttal witness, the State called Dr. George Barnard, a forensic psychiatrist, who conducted a court-ordered evaluation of Turner. Dr. Barnard first testified about Turner generally. Although Turner had no serious medical injuries, Turner had a rhythm disturbance in his heart with some scar tissue. According to Dr. Barnard, Turner's "only period of abusing alcohol as given by his history was he was drinking about a fifth a day for six months when he was in Viet Nam." Turner never had attempted suicide and, prior to the murders, had no history of psychiatric treatment. Dr. Barnard reported that Turner was "placed on medicine for treatment of depression" after his arrest for the murders.

In describing Turner's educational background, Dr. Barnard testified that Turner told him that "he had basically no learning problems while in school, . . . got along well with the teachers and the students, . . . [and] had no special education indicating any learning disability." Dr. Barnard concluded that Turner "[s]eemed to have a stable job history."

Dr. Barnard also testified extensively about Turner's service in the armed forces. Turner told Dr. Barnard that "he went into the Air Force in May, 1965, was honorably discharged in November, 1968, that his highest rank was a

20

sergeant, he never had gone AWOL but received Article 15 [military discipline] for being off the post and lost a stripe. He was an MP and later [in] a Ranger outfit, was in combat, as a security policeman." Turner further told Dr. Barnard that "he was in Viet Nam for six months in combat security police, that he was in combat but never injured, that he did some killing with a gun as the enemy was trying to overrun the position, that he had some friends who were killed." Dr. Barnard asked Turner if "killing bothered him and he said, no, that he was trained for it, that it didn't phase [sic] him . . . he was trained to kill with close combat tactics and I asked him about knives and he said yes." With respect to the significance of this training, Dr. Barnard stated:

> I think that the significance comes in the sense that he would have had the behaviors of using weapons and have had the experience of, you know, having gone through it and that would be different from somebody who had not had that type of experience. I did not get the flavor from him as I have in some of them who I have examined that he deprived [sic] pleasure from some of this killing or injuring process.

Regarding the marital discord, Dr. Barnard testified that Turner did not see divorce as an option because of his Catholic religion. Turner additionally told Dr. Barnard:

> . . . that he could not remember some of the details specifically surrounding the alleged crime. He gave me the history that he and his wife had had serious marital problems for some time, they had been separated, that he was greatly distressed over the separation and the circumstances of where she and their child was [sic] living, that he had tried to talk to her on a number of occasions to get her to come

21

> back, that she had refused to do so. He felt that this was contrary to the way that he had been raised and the way he thought that a family should be. . . . He told me that on the day preceding the criminal event that he had worked and got off from work about midnight, he had gone by the place where she was living and he thought that he heard her having intercourse with some man and that he went home after this feeling upset and went to bed, went to sleep, had some nightmares and his next memory was being questioned by the police at the time of his arrest.

Dr. Barnard further testified that Turner believed that his wife was having a lesbian affair with Joyce in the presence of his daughter, Anetra.

Regarding Turner's mental condition at the time of the murders, Dr. Barnard opined that he "felt that [Turner] was legally sane at the time" and that Turner "did have the ability to reason accurately," knew what he was doing, and "did know the wrongfulness" of his actions. Specifically, Dr. Barnard explained that Turner "was selective in the individuals he attacked, disregarding harming others about, that he responded to the officer at the time and was able to give indication that the woman [Joyce], who was one of the victims, had really screwed up his family." Dr. Barnard also specifically rejected a diagnosis of "brief reactive psychosis" (i.e., Dr. Stinson's diagnosis). Furthermore, Dr. Barnard testified that Turner believed that he was morally justified in committing the murders and that Turner felt "justified to feel enraged at her [(his wife)] because of what she was doing . . . to him and the family."

22

The State then elicited testimony from Dr. Ernest Miller, a psychiatrist at University Hospital in Jacksonville, who also conducted a court-ordered examination of Turner. Dr. Miller concluded that Turner "was not insane at the time of the alleged commission of the crime" and "was able to stand trial." Dr. Miller testified that Turner was "unable to recall the sequence of events which occurred during the crime period . . . [except] a few fragments before the crime [and] some fragments after being arrested."

Regarding Turner's mental health history, Dr. Miller testified that "there was no history of [mental illness], per se. He had not previously been treated by a psychiatrist, nor were there any hospitalizations. . . . He had undergone a mental evaluation under a Baker Act proceeding, . . . [but] [h]e was never admitted under the Baker Act."[8] Although Turner's wife had reported violent behavior and a personality change by Turner, Dr. Miller testified that the diagnosis after Turner's Baker Act evaluation on March 3, 1984, was marital problems. Turner was not viewed as "instantly dangerous," as follows:

> his wife had apparently imputed to him that he had made alleged
> homicidal threats to her, had shown violent behavior and refused to
> go to the hospital. She saw him as having a personality change,
> talking to himself. The patient on examination explained that he was
> presently in divorce proceedings and had arguments with her about
> [her] and her seven year old daughter and his accusations that his wife
> was engaging in homosexual contacts. The examiner at that point felt

---

[8]See supra note 7 regarding the Baker Act.

> that he was in good reality contact, was not depressed or agitated to the point that he was viewed as instantly dangerous. . . . Diagnosis, suffering marital problems.

Dr. Miller testified that based on that diagnosis, there was no basis to deprive Turner of his civil liberties.

Regarding Turner's physical health, Dr. Miller testified that Turner "reported that he had an irregular heartbeat, had hypertension and had reported scar tissue in his heart." Dr. Miller classified these infirmities as "psycho-physiologic problems."

Dr. Miller then testified about Turner's employment history, particularly in the electrical trade. Dr. Miller also reported that Turner "served in the United States Armed Forces for a couple of years [and] received an honorable discharge." Dr. Miller recounted that Turner "was an Air Force enlisted man, attained a non-commissioned rank at one point in his career, served in Viet Nam, did have some combat experience, did have some problems in the service . . . but did receive a good discharge." According to Dr. Miller, Turner related some of his combat experience, telling him that "[h]e fired in the direction of enemy troops, he saw no foe fall as a direct result of his fire. He was not involved in any atrocities." Turner was involved in "fire fights in terms of being responsible for the machine gunning on the perimeter of the Air Force bases." Turner "described his responsibility as, the perimeter defense of the Air Force bases at night." Turner,

however, "did not . . . witness directly any of his buddies being killed." Dr. Miller further testified that Turner never mentioned any hand-to-hand combat in Vietnam and that Turner "never tried to make [him] think that government had trained him to kill."

Turner informed Dr. Miller that, at the time of the murders, he was not using alcohol or controlled substances and did not "have a problem in habitual use of alcohol or drugs." Turner said that he drank in Vietnam and that "it was a problem for him in the service from time to time."

Dr. Miller opined that Turner did not have a mental disease or defect, but that Turner "did have an emotional disturbance, he was depressed and anxious related to the situation in which he immediately found himself, facing a psychiatrist, facing a legal proceeding, facing the loss of many things in his life." Dr. Miller testified that at the time of the murders Turner "was in a very highly charged emotional state so that his behavior was not always consistent with and in consonant with the progression of rational thought." Dr. Miller "did not think, however, at any time that [Turner's] behavior . . . could be described unequivocally and clearly as insane during the progression of the [murders]." According to Dr. Miller, psychological testing performed on Turner indicated that Turner had "a characterologic problem" and was "a man who might . . . conceivably, under stress, regress to a psychotic state."

25

Regarding the multiple wounds to the two victims, Dr. Miller testified that there were "an inordinate number of stab wounds and [that] in some cases . . . this tends to correlate with, at the very least, a highly charged emotional state and sometimes with psychotic state and sometimes with an insane state." Dr. Miller further testified how and why the victims were chosen purposefully, as follows:

> [t]he circumstances of the murder were such as to suggest . . . that this was not just simply a random senseless act, that the victims were chosen purposefully, that they had, rightly or wrongly, in his beliefs contributed in some manner to his unhappiness and to his sense of loss, that his wife had left him, had taken their children and that the other victim was an actor in this drama, that the other woman, Ms. Joyce, had induced or seduced his wife away from him and if it wasn't for her, his wife would still probably be home . . . . [Turner] had been brooding over this and felt anger, rage and a need for punishing people.

Dr. Miller stated that "there's a great deal of significance in the number of stab wounds used here, the obvious over-kill" and that the number of stab wounds indicated "the incredible amount of emotional content that was reverberating through the mind of this man at the time of the alleged crime." Furthermore, Dr. Miller described the events "as a passionate interchange at the time of the stabbing rather than a thoughtfully subjected knife wound delivery."

Dr. Miller disagreed with Dr. Stinson's diagnosis that Turner suffered from a "brief reactive psychosis" at the time of the crimes. Dr. Miller, however, did acknowledge that Turner had encountered an "acute stressor . . . the previous night . . . when he had reportedly heard or seen his wife engaged in some sexual liaison,

26

apparently in the presence of Anetra, his daughter, and this was sensitive, incensed him." According to Dr. Miller, that encounter "was certainly a stressor, but there was certainly a time lag between that particular acute stressor and the violence by [Turner] on the following day." Dr. Miller concluded that Turner "honestly believed that his wife was having a lesbian affair and [was] a prostitute in [Joyce's] house in the presence of his children." Dr. Miller further opined that if Turner's wife was neither a lesbian nor a prostitute, yet Turner still believed she was, "it would be a delusional belief."[9]

Regarding Turner's family medical history, Dr. Miller particularly mentioned Turner's sister, who died of a brain tumor at age fourteen, and his severely retarded younger brother. According to Dr. Miller, "[t]he likelihood of a brain tumor having a genetic transmissibility is minute. The presence of an intellectual handicap could represent a genetic potential. However, there was no indication . . . that an intellectual handicap of any substance exists with Mr. Turner so these are familial features I think are of doubtful consequence."

Dr. Miller further reported that Turner "was Catholic and this was important for him in maintaining the marriage." He stated that Turner tried to "prevail upon [Shirley] to see a priest for counseling and she refused."

---

[9]Dr. Miller also testified that Turner's father did not approve of the "way in which his son was handling the problem with his wife" and told his son that "he was a wimp in the way he was behaving with Shirley." Turner apparently also sought help from his brother-in-law "who said he wasn't about to take himself down to the ghetto to help him with his problem."

Dr. Miller also testified that his report referenced a heroism award given to Turner in 1983, recognizing his efforts to prevent a woman from being kidnapped. Dr. Miller opined that the event "indicated very positive moral approach toward other human beings [and] problem solving."

Dr. Miller explained that Turner's home burned down, the insurance did not cover the repairs, no one would lend Turner money to repair it, and Turner rebuilt the house himself. Immediately thereafter, Turner's family had "another financial disaster" when Shirley mismanaged a day nursery and subsequently wrote bad checks. Outlining other catastrophic events in Turner's life from 1982 through 1984, Dr. Miller testified that Turner:

> had other catastrophic events occur in his life, problems on the job, he suffered a heart attack, had to be evaluated and treated for that, and then in 1984 or late '83 he tried to provide an apartment for her to induce her to return . . . to him. She would not do so. Having been, in his view, under the control of Ms. Joyce, under the persuasion of Ms. Joyce during that time.

Dr. Miller agreed that these factors contributed to Turner's anger and rage.

Dr. Miller also described Turner as having "hot-blood" and described the term as "behavior in an individual who is filled with emotion, negative emotion, not positive emotion, not love, but hate and rage, fear." According to Dr. Miller, Turner was not insane at the time of the murders, but could have "suffered an isolated explosive disorder," although in his opinion Turner did not. Dr. Miller stated that such a disorder is a "recognized mental disease, infirmity or defect."

28

Dr. Miller also opined that Turner suffered from "a dissociation" at the time of the murders and that this was "the mind's protective device to block out the horrible experience." Dr. Miller explained that he was "unable to conclude on the basis of what [he] knew that [the murders] had been a premeditated act."

At the conclusion of the State's rebuttal evidence, the defense again moved for a judgment of acquittal based on sufficiency of the evidence regarding the murders and Turner's insanity. The state trial court denied the motion. On August 16, 1985, the jury found Turner guilty of two counts of first-degree murder for the deaths of Shirley and Joyce.

## E. Penalty Phase of Turner's Trial

Seven days after the guilty verdicts, the penalty phase of Turner's trial began on August 23, 1985. Before the penalty phase began, however, Turner's lawyers moved for a continuance for additional time to prepare for the penalty phase. Turner's lawyers asserted that the only material they could present the day the penalty hearing was scheduled was "only what [they had] been able to obtain in the last five days" leading up to the penalty hearing and that their "primary concern was sufficient time to prepare and that [August 23] did not afford [them] that time." The trial court explained on the record (a) that the parties had agreed to the date of August 23 and (b) that due to the unavailability of a juror as of

August 24th or August 26th,[10] that date was the only date that worked. The trial court then denied the motion for a continuance.

## 1. Defense Witnesses

During the penalty phase of Turner's trial, the State presented no evidence and the defense called six additional witnesses. The first defense witness was Turner's brother, Gregory Turner. Gregory described a defense exhibit as a group photograph of all his siblings, including Turner taken at least twenty-five years before the trial.[11] He described another photograph as a picture of Turner in the Air Force taken between 1965 and 1969. Gregory then read a prepared letter to the jury.

In the letter, Gregory described Turner's family, including his younger sister, Debra, who died at fourteen from a brain tumor, and his younger brother, Michael, who is profoundly retarded with Down's syndrome. According to

---

[10]One juror was a seaman aboard an aircraft carrier in the United States Navy. He was scheduled to ship out on one of those dates, and the Navy was unwilling to reschedule his departure. Furthermore, the State was unwilling to stipulate to seating an alternate juror or to using only eleven jurors and beginning the penalty phase as originally scheduled on September 6, 1985.

[11]The trial court admitted eleven separate defense exhibits during the penalty phase of Turner's trial: (1) a family photo; (2) a photo of Turner in the Air Force; (3) Turner's school records; (4) Turner's DOT personnel file; (5) a letter from Florida DOT Secretary Paul Pappas commending Turner's rescue of a kidnapped rape victim; (6) a newspaper article discussing Turner's rescue of a kidnapped rape victim; (7) a letter from State Representative Bankhead to Secretary Pappas regarding Turner's rescue efforts; (8) a Florida DOT medal; (9) Turner's Air Force enlistment papers; (10) Turner's marksmanship medal from the Armed Forces; and (11) Turner's honorable discharge.

Gregory, Turner, as the oldest child, "set an example for the rest of [the children]" and was their "protector." Gregory described Turner's childhood generally, including his involvement in church, the Boy Scouts, and school activities. Turner was the "first to leave for an extended period of time" when he went to college, but Turner returned when Debra died from the brain tumor. Gregory recalled that Turner joined the Air Force in an "effort to deal with her death."

Gregory further explained that Turner initially had a happy marriage. He recounted that Turner "was a good, devoted father" and "took his religious obligations to his daughters very seriously. . . . When he learned that Anetra had received her first communion, he broke down and cried." Turner was concerned about his daughters and his family even after his incarceration. Gregory also said that Turner continued to be religious while incarcerated, leading Bible discussions and having "a positive influence on him[self] and other inmates in his block."

The defense next elicited testimony from Joseph Johnson, the then records custodian for the Duval County School Board and Turner's former teacher at Douglas Anderson High School, from which Turner graduated in the early 1960s. Johnson testified about Turner's school records, which included Turner's "cumulus guidance folder," his grades, "an evaluation of social and personal assets," and "his personal interests." The records indicated that Turner had a 72 IQ and that he planned on going to college and "becoming a member of the

31

military, the Armed Forces." These school records were admitted and published to the jury. From his personal recollection of Turner as a student, Johnson further testified that Turner "was a humble, meek, a very gentle person," and that Turner "seemed to have gotten along quite well with [other students]."

The defense then called Frank Lee, an assistant maintenance engineer with the Florida DOT. Lee testified about Turner's personnel records with the DOT, which included performance ratings and pay. These records also were admitted into evidence.

The defense next called Mark Ballard, a maintenance electrician for the Florida DOT and Turner's immediate supervisor for two to three years. Ballard testified that Turner was "an excellent employee. He took very little supervision. You could tell him to do something, you didn't have to worry about it being done right . . . . If he saw something that needed to be done, you didn't have to tell him to do it, he'd go ahead and do it."

Supervisor Ballard also described a newspaper article recounting the time when he and Turner prevented a kidnapping and rape from occurring. Ballard noted that he and Turner had received an award for their intervention and rescue. He described a letter from State Representative William Bankhead to the Secretary of the DOT recommending that "their actions be rewarded and that a special commendation be placed in their employment files." The newspaper article, the

32

letter from Representative Bankhead, a response from DOT Secretary Paul Pappas[12] commending Turner for his bravery, and the medal given to Turner were all admitted into evidence and published to the jury.

The defense then elicited testimony from Dr. Miller, one of the forensic psychologists who testified for the State during the guilt phase. Dr. Miller testified that Turner "was of borderline intelligence," meaning that he was at a state "between normal intelligence and defective intelligence." Dr. Miller opined that Turner's borderline intelligence "limit[ed] Mr. Turner in terms of options which he might choose to exercise to solve his problems with respect to the decedents. He does not have, for instance, if you will, the wit to conceive alternative plans of dealing with these difficulties in his life."

Dr. Miller further explained that, on the morning of the murders, Turner was "suffering from extreme emotional disturbance" and that "a combination of rage and fear . . . , though very great and very disturbing to him subjectively and though [a]ffecting his behavior in consonance with the disturbance, did not . . . cause him to cross the line where he did not know what he was doing, the nature, quality and wrongfulness of it."

Dr. Miller concluded that Turner's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was "substantially

---

[12]Frank Lee had testified earlier that Paul N. Pappas was then Secretary of the DOT.

impaired." Dr. Miller explained that Turner felt legal or moral justification for the murders because he "was rightly or wrongly convinced and believed that his daughter was being subjected to unorthodox and potentially damaging sexual exhibitions. He otherwise viewed the environment as unwholesome."

As its sixth and final witness, the defense called William L. Turner, Turner's father. William first described a family photo containing all of his children at Turner's grandmother's house. William recalled how Turner assisted his parents in raising his younger brother, Michael, who was severely retarded and suffered from Down's syndrome. William and his wife "dedicated [their] life to this family and raising the family in our home." William considered his "close" relationship with his son Turner as "one of the best." As Turner's father, William "used to attend every football game, watch him in practice, carry him to all the scout meetings, [and] attended his scout camp out, Camp Cahooche." William recalled that Turner used to attend church every Sunday, said the rosary every day, and received religious instruction almost daily.

William further testified that Turner "had the finest relationship" with his siblings, "that he was a good protector for them, [and] they had a lot of fun." He reported that Turner got along with the neighbors and "did a lot of chores around the house." Turner also aided his mother in caring for her senile father and assisted with his father's tailoring business by ironing and pressing the clothing.

34

William then related how Turner left home for the first time to attend Gibbs Junior College and that he attended that school for two years. He recalled that Turner returned home to help his mother care for his fourteen-year old sister dying of a brain tumor. After his sister died, Turner informed his father that he could not study anymore and did not want to go back to school. Instead, he enlisted in the Air Force.

The defense then showed William Turner several exhibits already entered into evidence. These included a Certificate of Enlistment, an award for small arms marksmanship, and his son's honorable discharge. William noted that Turner "was so proud of" the marksmanship award. Turner communicated often with his family while he was in the Air Force and whenever possible while in Vietnam. William testified that Turner received "two or three awards given [to] him" in connection with his Vietnam service.

William also explained that after Turner was discharged from the Air Force, he returned to Jacksonville, held several different jobs, and went to school. According to William, Turner got married around 1969, went to work for the DOT, and Turner's hours varied depending on any emergencies with the bridges in Jacksonville. William commented that Turner and Shirley had a home together until it was destroyed by a fire. He recalled that Turner said that insurance would only pay eighty percent and that Turner would rebuild the house himself. William

recounted that Turner "put a big effort in rebuilding that home until he had . . . a heart attack" and was hospitalized.

William remained in "close contact" with Turner during Turner's marital difficulties, and Turner "would come over to the house for financial help to support his family. They would get bags of groceries [and] they would get financial help." Turner informed William that he met with a family mediator in an attempt to resolve his marital problems. Turner also told William that he wanted his children to be raised in the church.

After Turner's father testified, the defense rested. The State presented no rebuttal evidence in the penalty phase. Turner's father, thus, was the last witness in the trial.

## 2. Jury Instructions in Penalty Phase

After closing arguments by the State and the defense, the trial court instructed the jurors about its advisory sentence. The court explained that it was the jury's "duty to advise the Court as to what punishment should be imposed upon the defendant for his crimes of murder in the first degree." The court informed the jury that it was to "render to the Court an advisory sentence based upon [its] determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating evidence exists to outweigh any aggravating circumstances found to exist."

The trial court also instructed the jury that it should consider evidence from both the guilt and penalty phases. For example, the court instructed the jury that its "advisory sentence should be based upon <u>the evidence that you have heard while trying the guilt or innocence of the defendant and the evidence that has been presented to you in these proceedings</u>." (Emphasis added).

The trial court also informed the jury about both the aggravating and mitigating factors. The court instructed the jury that it could consider these four aggravating circumstances: (1) Turner had previously been convicted of another violent capital offense, even though occurring simultaneously with the conviction of another capital felony; (2) the crime was committed while Turner was engaged in attempting to commit, committing, or fleeing from the crime of burglary; (3) the crime Turner committed was "especially wicked, evil, atrocious or cruel;" and (4) the crime was committed in a "cold, calculated and premeditated manner without any pretense of moral or legal justification."

Regarding mitigating circumstances, the trial court instructed the jury it could consider: (1) whether the crime for which Turner was to be sentenced was "committed while he was under the influence of extreme mental or emotional disturbance;" (2) whether Turner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially

impaired; (3) any other aspects of Turner's character or record and any other circumstance of the offense.

After deliberations, the jury, by a seven to five vote, returned an advisory sentence of life imprisonment without possibility of parole for twenty-five years for Turner's murder of Shirley. The jury, also by a seven to five vote, returned an advisory sentence of the death penalty for Turner's murder of Joyce. The advisory sentences were rendered on August 23, 1985.

### 3. Sentencing Hearing Before Trial Judge

On October 3, 1985, prior to imposing a sentence, the state trial court conducted an additional hearing. At this hearing, the court allowed the State and Turner to submit additional material to be considered by the court in determining Turner's sentences. At this October 3 hearing, defense counsel specifically requested additional time to obtain Turner's military records from the federal government to assist the defense in obtaining mitigating testimony from Turner's superior officers. The trial court expressly instructed the parties that they could continue to supplement the record with additional material: "If there are any written records that can be obtained within a reasonable period of time, they may be supplemented as far as adding them for purpose of sentencing without any further hearings."

Accordingly, the defense submitted several memoranda between the October 3 hearing and the trial court's sentencing of Turner on November 1. First, the defense submitted a memorandum of law requesting that the trial court "consider the existence of any mental disturbance as a significant statutory mitigating factor." The defense's memorandum emphasized that even if Turner's mental disturbance was not statutorily extreme, the court still must consider "non-extreme" mental disturbance as nonstatutory mitigation. This memorandum recounted the trial testimony from the psychiatrists and Turner's family regarding the stresses Turner felt from the break-up of his family.

The defense submitted another memorandum regarding sentencing generally, in which it outlined "certain matters [that were] conclusive and to the Defendant's benefit for sentencing purposes." This memorandum summarized evidence of Turner's employment, family relationships (noting specifically that Turner's children were being raised Catholic despite the fact that his wife was not Catholic, indicating a strong paternal influence), and military history (noting that Turner enlisted for duty in Vietnam). This memorandum also pointed out that the penalty phase evidence about Turner's heroic acts at the DOT demonstrated that Turner "had an extraordinary sense of right and wrong when not confronted with or succumbing to the emotional turmoil of his immediate family problems." This memorandum also argued that the death penalty would not be a proportional

punishment for Turner's crime since it was "committed as a result of violent domestic difficulties." This memorandum also contained comments from Detective Zipperer urging the trial court not to sentence Turner to death. Detective Zipper had encountered Turner on several occasions prior to the murders.

Attached to this second memorandum were numerous exhibits relating to Turner's mental health (including evaluations by each psychiatrist who testified at trial, a psychological profile by a clinical psychologist who did not testify at trial, and orders from the Baker Act proceeding), the domestic restraining order against Turner, and papers from the Turners' divorce proceedings, including the divorce petition and a family mediation referral. Specifically the psychiatric evaluations were reports from Dr. Stinson, Dr. Miller, and Dr. Barnard, each of whom testified from their respective reports at trial.

Dr. Stinson's report closely mirrored his trial testimony. Additional relevant details in his report were that (1) on the morning of the murders, Turner only wanted to pick up his daughter and denied planning to kill anyone, (2) Turner is currently depressed and still has nightmares, and (3) while in Vietnam, Turner was under sniper fire at one time, and after he returned to the United States, Turner, for a while, would hit the dirt when lightning flashed.

Dr. Miller's report also reflected his trial testimony. Additional relevant details in his report were that (1) Turner was convinced Shirley's friends were trying to kill him, (2) Turner never carried a weapon to protect himself, (3) Turner "remembers poignantly one time his little daughter waiving at him from the window when he tried to see her, and then someone stopping the child," (4) Turner received a Good Conduct Medal and a Vietnam Campaign Medal for his service in the Air Force, (5) Turner never came to the attention of the Juvenile Courts in his youth, and (6) Turner had dreams of Vietnam for a year or so after his tour of duty.

Dr. Barnard's report also echoed his trial testimony. Additional relevant details contained in his report were that (1) Turner saw his wife "feeling another man up" on one occasion, while the man and Turner's wife laughed at him and (2) Turner was never expelled or suspended from school.

Finally, in a third memorandum entitled "Memorandum in Aid of Sentencing," the defense analyzed (1) whether there was any reason for the court to reject the jury recommendation of life in prison for Turner's murder of Shirley and (2) whether the record disclosed strong rationales why reasonable persons could not agree with a sentence of death for Turner's murder of Joyce. Regarding the recommended death sentence, this third memorandum analyzes the lack of aggravating, and the presence of mitigating circumstances. This memorandum points out that "[m]itigation is not limited to the statutorily enumerated factors and

41

need not be proven to any certain standard." The memorandum then recounts all of the mitigating evidence available, including (1) Turner's "extreme mental or emotional disturbance," (2) Turner's capacity to appreciate the criminality of his conduct was substantially impaired, (3) Turner had no significant history of violent criminal activity, (4) Turner's service in Vietnam, (5) Turner was a good family man and father, (6) Turner was a diligent and conscientious employee, and (7) Turner previously had demonstrated unselfishness and concern for others.

At this same October 3, 1985 hearing, the trial court also reviewed Turner's PSI with both parties. The PSI contained (a) general background information on Turner, much of which came out through trial testimony and (b) information regarding Turner's tumultuous and often violent relationship with Shirley. The PSI discussed two separate instances in which Turner committed battery on Shirley. During one incident, Turner rammed his car into a car that Shirley was driving, threatened to kill her, engaged the police in a high-speed car chase, and was found with a revolver in his car.

After reviewing the PSI, the trial court at this October 3 hearing heard arguments from the State and the defense regarding the presence of aggravating

and mitigating circumstances.[13]  The court then scheduled the sentencing for November 1, 1985.

### 4. Turner's Sentence

On November 1, 1985, the state trial court sentenced Turner after "deliberat[ing] the jury's conclusion for many weeks, weighing the advisory sentence, and reviewing the evidence to determine the presence of aggravating and mitigating circumstances."[14]  The trial court adopted the jury's recommendations and sentenced Turner to life in prison without possibility of parole for twenty-five years for the murder of Shirley and to death for the murder of Joyce.

Before announcing the death sentence, the trial court made extensive findings regarding the aggravating and mitigating circumstances.  Because this appeal focuses so heavily on those circumstances, we recount the trial court's findings in great detail, as follows:

> The statutory aggravating circumstances.  The Court finds that the aggravating circumstances set forth in Florida Statute 921.1415 little A, C, E, F and G are inapplicable in this case.  However, the provision of Florida Statute 921.1415 B, D, H and I are applicable as set forth below.

---

[13]These arguments are essentially contained in the defense's third memorandum written in aid of sentencing.

[14]A month later at sentencing, the defense still was unable to obtain certain records of Turner's military service from the federal government.  Nonetheless, the trial court determined that it had given "as much additional time as [it] thought possible" to obtain the records and that the court would "not accept [the absence of the files] as a legal reason for not imposing sentence" in the case.

Number one, the defendant previously [was] convicted of another capital felony involving the use of threat or violence to the person. The defendant stands convicted of first degree murder in the death of Shirley Turner in count one of the indictment in the instant case. While each conviction may operate as an aggravating factor to the other, it would appear more proper to consider these convictions in the chronological order in which the murders occurred. This consideration may also explain the jury's recommendation as to each count. This is the most significant factor considered by the Court in imposing sentence.

Number two, the capital felony was committed while the defendant was engaged in the commission of an enumerated felony under Florida Statute 921.1415D. The evidence is clear that the defendant committed the murder while engaging in the commission of or attempt to commit or flight after committing or attempting to commit the crime of burglary.

The evidence at trial was uncontroverted that the defendant broke into 1053 West Monroe Street, the residence of Joyce Brown, without her consent and with the intent to commit an offense therein.

Three, the capital felony was especially heinous, atrocious or cruel. The victim, Joyce Brown, was stabbed and slashed 51 times by a knife in the hand of the defendant. This was done on the expressway exit street in Jacksonville in the presence of numerous witnesses who were attempting to detract or stop the defendant by throwing objects at him. At the time of her death, Joyce Brown was in telephonic communication with the Jacksonville Sheriff's Office and her fear, terror and emotional strain preceding her death are clearly evidenced by the tape recording of her last moments.

The defendant began and completed his vicious attack despite the pleadings of the victim.

Four, the capital felony was a homicide and was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. The defendant had previously threatened to kill his wife, Shirley Turner, and on the day of the crime came to the residence armed with a single shot shotgun and knife. After repeatedly loading, firing and reloading the shotgun and firing into the house, the defendant physically broke into the house and murdered his wife, Shirley Turner, by stabbing her 22 times. Shirley Turner was one of four occupants in the house at that time and the

44

evidence is clear that the defendant selected his target in a cold, calculated and premeditated manner.

During this attack Joyce Brown fled the residence and ran to a nearby telephone [booth] where she made contact with the Jacksonville Sheriff's Office. The defendant, with sufficient time to contemplate his actions, carefully chose his second victim. He pursued Joyce Brown, confronted her and accomplished his purpose and only ceased his attack when police officers arrived on the scene. Those are the aggravating factors.

Statutory mitigating circumstances considered by the Court. The mitigating circumstances set forth in Florida Statute 921.1416 C, D, E and G are not applicable in the instant case. The first circumstance considered by the Court, the defendant has no significant history of prior criminal activity. The defendant's prior criminal record is set forth in the presentence investigation. While it may be argued that the record is insignificant, it must be noted that one prior arrest and plea of nolo contend[e]re was on a charge of battery to Shirley Turner and that pleas of nolo contend[e]re to fleeing and attempting to elude police, reckless driving and leaving the scene of an accident resulted from his ramming a car driven by Shirley Turner and then fleeing the police. When apprehended the defendant threatened to kill Shirley Turner and stated that he had a gun which was found in his possession.

Viewed in light of the instant case, the defendant's prior criminal activity cannot be considered insignificant.

Three, the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance. There is ample evidence to support the conclusion that the defendant was under the influence of mental or emotional disturbance. This was demonstrated by the defendant's actions and behavior during the year preceding the murders and expressed by the opinions of the experts who testified at the sentencing hearing. While there has been a conflict in the trial testimony of the psychiatric experts, the Court finds that the defendant suffered from no mental disease or defect. Whatever mental or emotional disturbance existed in the defendant at the time of the commission of the crimes had existed for a period of time and there was no evidence–or excuse me–there were no sudden events which would trigger any escalation of the disturbance. Additionally, it appeared that the defendant was perfectly capable of performing his job and getting along well with fellow employees.

The keyword in evaluating this mitigating circumstance is extreme. The assertion that the defendant was under the influence of extreme mental or emotional disturbance is specifically rejected as a mitigating circumstance.

Four, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. This circumstance is obviously closely akin to that of extreme mental or emotional disturbance and the Court and jury must rely on much of the same evidence in weighing these factors. The testimony of the psychiatric experts has been given careful consideration by the Court, but other facts established by the evidence are that the defendant stopped his attack on Joyce Brown when a police car passed on the street and resumed the attack after the passing and, further, that when confronted by Officer Venosh shortly after the murder, the defendant responded to the officer's commands at gunpoint.

While there is ample evidence to find that the defendant was impaired, the Court specifically rejects the contention that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.

The defendant has produced evidence of the following non-statutory factors. One, the defendant served his country honorably in time of war. The Court finds this factor to exist, but must consider the fact that the defendant was discharged in 1968. The Court attaches no significance to this fact.

Two, the defendant was a good family man and father. The Court finds that this factor was not proven and rejects this assertion as a mitigating circumstance.

Three, the defendant was a diligent and conscientious employee. The Court finds that this factor was proven but attaches little significance as a mitigating circumstance.

Four, the defendant has in the past demonstrated concern for others and unselfishness. The Court find[s] that the defendant has exhibited such traits in the past but considers the weight of such mitigating circumstances to be only slight.

Based on these findings, the trial court sentenced Turner to death for the murder of

Joyce.

## F. Direct Appeal

On direct appeal, Turner raised twelve issues.[15]  Before issuing its decision,

the Florida Supreme Court "relinquished jurisdiction" over Turner's direct appeal

to the trial court for an evidentiary hearing on Turner's absence from certain

portions of trial, including voir dire.  Only after an evidentiary hearing and order

from the trial court summarizing its findings did the Florida Supreme Court issue

its decision affirming Turner's convictions and sentences.  See Turner v. State,

530 So. 2d 45 (Fla. 1988).

In its opinion, the Florida Supreme Court summarily determined that

Turner's first eight issues lacked merit.  Turner, 530 So. 2d at 47 n.1.  The Court

discussed the four remaining enumerated errors and concluded that none

warranted a new trial or resentencing.  First, the Florida Supreme Court decided

that Turner had not waived his right to be present during voir dire, but that

Turner's absence was "harmless."  Id. at 49.  Second, it determined that Turner

---

[15]The twelve issues on direct appeal were whether (1) the court abused its discretion in excluding Baker Act evidence; (2) the state failed to prove beyond a reasonable doubt that Turner was sane at the time of the crime; (3) there was insufficient evidence of premeditation; (4) the court erred in instructing the jury on felony-murder; (5) the court improperly refused Turner's requested instruction on age and duress as mitigating factors; (6) the court improperly rejected statutory and nonstatutory mitigating factors; (7) the court improperly doubled the aggravating factors that the murder was heinous, atrocious and cruel, and cold, calculated and premeditated; (8) the court gave undue weight to the jury's recommended death sentence; (9) Turner was entitled to a new trial because of his claimed involuntary absence from voir dire; (10) Turner was involuntarily absent from the jury charge conference in chambers; (11) the court abused its discretion in allowing the 911 tape into evidence; and (12) the trial judge erred in his findings regarding the aggravating factors justifying the imposition of the death penalty for Joyce's murder.  Turner v. State, 530 So. 2d 45, 47, 47 n.1, 50 (Fla. 1988).

47

"knowingly acquiesced in his counsel's waiver" of his right to be present in the jury charge conference in the judge's chambers. Id. at 50. The Court noted that "[c]ounsel conferred with Turner, and then waived Turner's presence stating that Turner was tired and wished to return to his cell for dinner." Id.

Third, the Florida Supreme Court concluded that the 911 tape was relevant to premeditation, that the "trial court has wide discretion concerning the admission of evidence," and that Turner had "shown no abuse" by the trial court. Id. Fourth, the Court ruled that the trial court had correctly found that aggravating factors justifying the imposition of the death penalty were present. Turner challenged these three of the four aggravating factors: (1) that he was engaged in the commission of a burglary during the murder; (2) that the murder was especially heinous, atrocious, and cruel; and (3) that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. Id. at 50-51. The Florida Supreme Court disagreed with Turner's contentions and found that each of these aggravating factors was present. Id.

After the Florida Supreme Court affirmed Turner's convictions and sentences, the United States Supreme Court denied certiorari on February 21, 1989. Turner v. Florida, 489 U.S. 1040, 109 S. Ct. 1175 (1989).

## G. Rule 3.850 Motion

48

On March 29, 1990, Florida's Governor signed a death warrant ordering Turner's execution. On April 26, 1990, Florida's Office of the Capital Collateral Representative moved for a stay of execution in the Florida Supreme Court, asserting that it could not represent Turner and requesting that substitute counsel be appointed. The Florida Supreme Court granted a stay, and new counsel was appointed to represent Turner.

On October 15, 1990, Turner filed a Rule 3.850 "Motion for Post Conviction Relief" in the state trial court and an Appendix containing seventy-eight exhibits.[16] The exhibits in Turner's Appendix include: (1) fifty-two affidavits from family members, witnesses, psychologists, coworkers, and other people who knew Turner at varying points in his life; (b) military records and documents on Turner's service in Vietnam; and (c) articles and book excerpts about the circumstances surrounding Turner's tour of duty with the Air Force in Vietnam. At no point during the Rule 3.850 proceedings did the State attempt to dispute, rebut, or call into doubt any of the factual information submitted in Turner's Appendix.

Turner's Rule 3.850 motion alleged sixteen separate claims for relief. Turner's Rule 3.850 motion specifically asserted, inter alia, that his trial counsel

_____

[16]Florida Rule of Criminal Procedure 3.850 provides the guidelines under which a convicted criminal defendant in Florida may move to vacate, set aside, or correct his sentence. See Fla. R. Crim. P. 3.850.

49

(1) failed to adequately investigate, prepare, and present mitigating circumstances in the penalty phase and (2) failed to investigate and arrange for consistent mental health assistance.[17]

On November 6, 1990, and without a hearing, the trial court denied Turner's Rule 3.850 motion. The trial court summarily concluded that the claims Turner litigated on direct appeal and then re-asserted in his Rule 3.850 motion could not be challenged in that motion for postconviction relief. The trial court also summarily determined that any issues which Turner could have raised on direct appeal could not be brought for the first time in Turner's Rule 3.850 postconviction relief proceedings. The trial court examined Turner's ineffective-

---

[17]Turner's fourteen other claims in his Rule 3.850 motion were that: (1) the trial court applied the Florida statutory scheme for the weighing of aggravating and mitigating circumstances in an arbitrary and capricious manner; (2) the Florida sentencing scheme placed upon Turner the burden of proving that death was not the appropriate sentence; (3) trial counsel was ineffective at the guilt phase; (4) trial counsel failed to effectively challenge the application of aggravating factors; (5) trial counsel failed to object to improper prosecutorial argument relative to nonstatutory aggravating factors; (6) trial counsel failed to argue that giving Turner the burden of proving that life was the appropriate sentence violated his right to a reliable sentencing determination; (7) trial counsel failed to object to victim-impact evidence in violation of Booth v. Maryland, 482 U.S. 496, 107 S. Ct. 2529 (1987); (8) trial counsel failed to object to instructions and arguments that diminished the jurors' sense of responsibility in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S. Ct. 2633 (1985); (9) trial counsel failed to object to the trial court's and the prosecutor's assertions that sympathy and mercy were improper considerations for the jury; (10) trial counsel failed to ensure a reliable and individualized capital-sentencing determination; (11) the cumulative effect of prosecutorial misconduct rendered the trial and sentencing proceedings fundamentally unfair; (12) the murder was not "cold, calculated, and premeditated" as defined by Rogers v. State, 511 So. 2d 526 (Fla.1987), and the trial court failed to limit construction of this aggravating factor in violation of Maynard v. Cartwright, 486 U.S. 356, 108 S. Ct. 1853 (1988); (13) the trial court's instructions concerning the "heinous, atrocious, or cruel" aggravating factor conflict with Cartwright; and (14) the trial court failed to record the charge and bench conferences and trial counsel failed to object.

assistance-of-counsel claims in more detail, but ultimately concluded that Turner's allegations were insufficient and his claims lacked merit.

The Florida Supreme Court affirmed the trial court's denial of Turner's Rule 3.850 motion. Turner v. Dugger, 614 So. 2d 1075, 1077 (Fla. 1992). The Court's opinion addressed each of Turner's sixteen enumerated errors. Of specific import to the claims at issue here, the Florida Supreme Court expressly determined that Turner's trial counsel was not ineffective in his investigation and presentation of mitigating evidence on Turner's behalf.[18] The Court stressed that "[a] review of the record reveals that counsel presented evidence relating to Turner's good character, heroic effort in preventing a rape, family background, intellectual ability, educational achievement, military service, employment, emotional anguish over the loss of his marriage and family, religious feelings, financial hardship, and health problems." Id. at 1078.

The Florida Supreme Court further emphasized that "[t]he record also reveals that trial counsel presented evidence relating to Turner's mental state at the

---

[18]The Florida Supreme Court stated:
 In claims 2 and 12, Turner alleges that trial counsel was ineffective in that he failed to investigate and present mitigating circumstances, he failed to argue for a finding of nonstatutory mitigation, and he failed to inform the jurors in closing argument that they could consider mitigating evidence during the guilt phase. In support of his claims that counsel was ill-prepared to present mitigation evidence, Turner points to his motion for continuance, which was denied just prior to sentencing. The trial court found no merit to these claims and we agree.
Turner, 614 So. 2d at 1078.

time of the offense through the testimony of three mental health experts, two during the guilt phase and one in the penalty phase." Id. The Court also pointed out that Turner's counsel "argued in a presentence memorandum that there was sufficient evidence to constitute nonstatutory mitigation under Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954 (1978), and Eddings v. Oklahoma, 455 U.S. 104, 102 S. Ct. 869 (1982)." Turner, 614 So. 2d at 1078. The Court also noted that the trial court's jury instructions adequately informed the jurors that they could consider mitigation evidence presented in the guilt phase also during the sentencing phase. Id. Applying the Strickland v. Washington standard, the Court found that defense counsel's performance was not "'outside the wide range of professionally competent assistance.'" Turner, 614 So. 2d at 1078 (quoting Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984)).

## H. State Habeas Petition

At the same time Turner filed his Rule 3.850 motion in the state trial court, Turner also filed an "Amended Petition for Extraordinary Relief and for a Writ of Habeas Corpus" in the Florida Supreme Court. Turner's Amended Petition raised these three issues: (1) that Campbell v. State, 571 So. 2d 415 (Fla. 1990), and other cases decided after his direct appeal should be applied retroactively to his case; (2) that his appellate counsel was ineffective for a number of reasons; and (3) that the trial court erred in not requiring the jury to specify whether his murder

convictions were based on premeditation or felony murder. <u>Turner</u>, 614 So. 2d at 1080-81.

Regarding retroactive application of certain of its decisions that had been issued after Turner's direct appeal, the Florida Supreme Court concluded that the argument was without merit because "none of the cases Turner relies on is such a 'jurisprudential upheaval' in the law as to require retroactive application on collateral attack." <u>Id.</u> at 1080 (citing <u>Witt v. State</u>, 387 So. 2d 922 (Fla. 1980)). It also rejected each of Turner's ineffective assistance of appellate counsel claims because many of the claims were arguments already rejected on direct appeal and others simply lacked merit. <u>Turner</u>, 614 So. 2d at 1080-81. The Florida Supreme Court also rejected the contention that special verdict forms should have been used, explaining that they are not required by Florida law and defense counsel did not object at trial to the verdict forms that were used on the basis raised in Turner's state habeas petition. <u>Id.</u> at 1081.

## I. § 2254 Petition

On July 15, 1993, Turner filed a petition for a writ of habeas corpus in federal district court pursuant to 28 U.S.C. § 2254. Turner's § 2254 petition raised these eleven claims: (1) ineffective assistance of state trial counsel at the guilt and penalty phases; (2) ineffective assistance of state appellate counsel; (3) denial of Turner's right to be present during critical stages of his trial; (4) Florida courts'

53

failure to consider nonstatutory mitigation evidence and factors; (5) Florida's unconstitutionally vague aggravating circumstances that were incorporated in jury instructions at trial; (6) improper application of Florida's capital sentencing statute; (7) lack of special verdicts at the guilt and penalty phases; (8) denial of due process stemming from introduction of the 911 tape and certain photographs; (9) improper burden shifting that required Turner to prove that death was not an appropriate sentence; (10) improper prosecutorial argument tainting the guilt and penalty phases; and (11) the Florida courts' failure to grant Turner an evidentiary hearing required the federal court to conduct an evidentiary hearing.

Seven years after Turner's § 2254 petition was filed, the district court dismissed several of Turner's claims in an order entered on September 4, 2001. It dismissed Turner's claim regarding the appropriateness of jury instructions as legally and procedurally barred and dismissed Turner's burden-shifting claims as procedurally barred. The district court also struck Turner's claim for an evidentiary hearing. On January 16, 2002, however, Turner filed another request for an evidentiary hearing.

On June 26, 2002, in an exhaustive 291-page order, the district court denied Turner's request for an evidentiary hearing, denied his § 2254 petition, and dismissed the case with prejudice except for Turner's mental retardation claim under Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002). In denying

Turner's § 2254 petition, the district court detailed and analyzed each of Turner's remaining claims at length. Specifically with respect to Turner's ineffective assistance claim, the district court summarized the mitigating evidence adduced at trial and reviewed all of the additional information submitted in Turner's Appendix. The district court concluded that the evidence in the Appendix largely was cumulative and that, therefore, Turner's counsel was not ineffective. In so concluding, the district court determined that trial counsel's performance was neither deficient nor prejudicial.

On September 20, 2002, Turner timely filed a petition for a certificate of appealability in this Court. On November 27, 2002, this Court granted a certificate of appealability on (a) whether Turner received effective assistance of trial counsel during the penalty phase of trial and (b) whether Turner's claim that his death sentence violated the Sixth Amendment under Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002), is procedurally defaulted and, if not, whether the constitutional principle in Ring applies retroactively on collateral review.

## II. STANDARD OF REVIEW

Turner filed his § 2254 petition in 1993, well prior to April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132 (1996), 28 U.S.C. § 2241, et seq. Therefore, Turner's petition is governed by pre-AEDPA law. Lindh v. Murphy, 521 U.S.

320, 336-37, 117 S. Ct. 2059, 2068 (1997); <u>Brownlee v. Haley</u>, 306 F.3d 1043, 1058 (11th Cir. 2002). Under pre-AEDPA law, this Court reviews <u>de novo</u> the district court's denial of Turner's § 2254 petition and that court's subsidiary legal conclusions. <u>See</u>, <u>e.g.</u>, <u>Yeck v. Goodwin</u>, 985 F.2d 538, 540 (11th Cir.1993); <u>Oliver v. Wainwright</u>, 782 F.2d 1521, 1524 (11th Cir.1986). The district court's findings of fact, however, are subject to review under the clearly erroneous standard. <u>See Williams v. Turpin</u>, 87 F.3d 1204, 1209 (11th Cir.1996). Whether a defendant received ineffective assistance of counsel is a mixed question of law and fact, and we therefore review it <u>de novo</u>. <u>Brownlee</u>, 306 F.3d at 1058 (citing <u>Hagins v. United States</u>, 267 F.3d 1202, 1204 (11th Cir. 2001).

In addition, the state court's findings of fact are entitled to a presumption of correctness and may be ignored only if the petitioner shows by clear and convincing evidence that the state court's determination was not "'fairly supported by the record.'" <u>Griffin v. Wainwright</u>, 760 F.2d 1505, 1511 (11th Cir.1985) (quoting pre-AEDPA § 2254(d)(8)). This presumption is equally applicable to the state appellate court's findings of fact. <u>See</u>, <u>e.g.</u>, <u>Sumner v. Mata</u>, 449 U.S. 539, 549, 101 S. Ct. 764, 770 (1981). "This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record." <u>Marshall v. Lonberger</u>, 459 U.S. 422, 432, 103 S.

56

Ct. 843, 850 (1983) (internal quotation marks and alteration omitted); see

Brownlee, 306 F.3d at 1059.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Turner's initial claim is that he received ineffective assistance of counsel

during the penalty phase of his trial due to his trial counsel's failure to present

certain pieces of mitigating evidence. As part of that ineffective assistance claim,

Turner first argues that the district court erred in not granting him an evidentiary

hearing.

### A. Evidentiary Hearing

The problem with Turner's evidentiary hearing claim is that the State of

Florida did not challenge, rebut, or dispute the factual statements contained in

Turner's seventy-eight exhibit Appendix, and, thus, there was no reason or basis

for an evidentiary hearing on that claim. Where the material facts are in dispute,

the federal court in habeas corpus proceedings holds an evidentiary hearing if the

habeas applicant did not receive a full and fair evidentiary hearing in the state

court. Stinson v. Wainwright, 710 F.2d 743, 745 (11th Cir. 1983); see also Smith

v. Gearinger, 888 F.2d 1334, 1339 (11th Cir. 1989).[19] In Turner's case, however,

---

[19]This standard applies because Turner's petition was filed prior to the effective date of AEDPA. We note that post-AEDPA, 28 U.S.C. § 2254(e)(2) applies and provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

there are no such facts in dispute.[20]  All of the facts stated in the affidavits, military

records, book excerpts, and other materials contained in the seventy-eight exhibit

Appendix are undisputed and uncontroverted.  The State of Florida has never

challenged, much less attempted to rebut, any of the additional evidence Turner

proffered during his state post-conviction proceedings and then again in his §

2254 proceedings.

Turner argues that he "is entitled to an evidentiary hearing if his allegations,

taken as true, might merit relief." Harich v. Dugger, 844 F.2d 1464, 1469 (11th

Cir. 1988) (en banc), overruled on other grounds by Davis v. Singletary, 119 F.3d

1471 (11th Cir. 1997).  But what Turner ignores is that his uncontroverted factual

proffer already has been taken as true throughout both his state and federal post-

conviction proceedings, and that the reviewing courts in those proceedings have

determined the facts, as contained in that Appendix, do not merit relief.  Indeed,

---

(A) the claim relies on--
    (i) a new rule of constitutional law, made retroactive to cases on collateral review
    by the Supreme Court, that was previously unavailable; or
    (ii) a factual predicate that could not have been previously discovered through the
    exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing
evidence that but for constitutional error, no reasonable factfinder would have found the
applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

[20]Where facts have been in dispute, Turner has, in fact, received an evidentiary hearing.
During direct appeal, the Florida Supreme Court relinquished jurisdiction to the state trial court
for an evidentiary hearing on Turner's absence from certain portions of his jury trial. See Turner,
530 So. 2d at 46.

Turner has received the benefit of having all of the evidence contained in his Appendix accepted as true without ever having that evidence subject to cross-examination by, or additional rebuttal evidence from, the State. There is no need for an evidentiary hearing in this case "to resolve the historical facts concerning counsel's performance and the mitigating evidence that [Turner] contends should have been presented" because (1) there are no historical facts in dispute and (2) Turner, in fact, has presented, in his state and federal post-conviction proceedings, the evidence he contends should have been presented in mitigation. Glock v. Singletary, 84 F.3d 385, 386 (11th Cir. 1996).

Turner's § 2254 petition also is not one in which an evidentiary hearing is required because "the relevant factual issues were not developed at the state level." Wiley v. Wainright, 709 F.2d 1412, 1413 (11th Cir. 1983). During Turner's post-conviction proceedings, the state courts had the full benefit of Turner's seventy-eight exhibit Appendix, including fifty-two affidavits and the other information contained therein. Further, Turner's counsel has not identified, much less proffered, any additional evidence Turner would have presented beyond that Appendix which has never been controverted by the State. Therefore this § 2254 appeal does not involve a case in which we cannot adequately assess Turner's claim without further factual development. Accordingly, the district court did not err in denying Turner's request for an evidentiary hearing.

**B. Principles Governing Ineffective Assistance Claims**

We now turn to Turner's claim that his trial counsel was ineffective in failing to present additional mitigating evidence during the penalty phase of the trial. Before addressing the merits of Turner's claim, we outline the principles governing ineffective assistance of counsel claims. "The Sixth Amendment guarantees a criminal defendant the right of effective assistance of counsel during a capital sentencing hearing." Harris v. Dugger, 874 F.2d 756, 762 (11th Cir. 1989). The penalty phase during a capital trial has a special role in determining a convicted murderer's sentence. The "primary purpose of the penalty phase is to insure that the sentence is individualized by focusing [on] the particularized characteristics of the defendant. By failing to provide such evidence to the jury, though readily available, trial counsel's deficient performance prejudice[s a petitioner's] ability to receive an individualized sentence." Brownlee, 306 F.3d at 1074 (alterations in original) (quotation marks and citation omitted).

The test for ineffective assistance of counsel set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), applies in a capital sentencing proceeding. Glock v. Moore, 195 F.3d 625, 634-35 (11th Cir. 1999). In Strickland, the United States Supreme Court established a two-part test to show ineffective assistance of counsel that violates the Sixth Amendment: (1) "the defendant must show that counsel's performance was deficient," defined as

"representation [that] fell below an objective standard of reasonableness;" and (2) "the defendant must show that the deficient performance prejudiced the defense" by demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687, 688, 694, 104 S. Ct. at 2064, 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068. The benchmark for counsel's performance is "reasonableness under prevailing professional norms." Id. at 688, 104 S. Ct. at 2065.

Trial counsel's performance is entitled to "'highly deferential' judicial scrutiny." Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001) (citation omitted). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. This Court en banc established this guideline: "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987)). Thus, under federal law, there is "a strong presumption in favor of competence [and] the petitioner's burden of persuasion–though the presumption is not

61

insurmountable–is a heavy one." Chandler, 218 F.3d at 1314 (footnote and citations omitted); see also Strickland, 466 U.S. at 689-90, 104 S. Ct. at 2065-66 (noting that courts must "indulge [the] strong presumption" that counsel's performance was reasonable and that counsel "made all significant decisions in the exercise of reasonable professional judgment"). Accordingly, this Court "must recognize that counsel does not enjoy the benefit of unlimited time and resources," and that "[e]very counsel is faced with a zero-sum calculation on time, resources, and defenses to pursue at trial." Chandler, 218 F.3d at 1314 n.14.

## C. Mitigating Evidence Presented by Trial Counsel

We now address the merits of Turner's argument that his trial counsel was ineffective during the penalty phase. Specifically, Turner contends that his trial counsel failed to investigate and to prepare mitigating evidence in four main areas: (1) severe mental illness at the time of the murders; (2) Vietnam combat duty; (3) exemplary citizenship; and (4) high potential for rehabilitation and good custodial conduct.[21] The gravamen of Turner's § 2254 petition is that his trial counsel was

---

[21]Turner additionally identifies his mental retardation as a fifth area in which his counsel should have investigated and presented mitigating evidence. To the extent that Turner argues that evidence of mental retardation would preclude his execution under Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002), we specifically decline to address any Atkins arguments as Turner currently has an Atkins-based Rule 3.850 motion pending in a Florida court. To the extent that Turner argues that mental retardation acts as indicia of a "diminished capacity," which supports "a finding that the crime was committed under the influence of extreme mental or emotional disturbance," Brownlee, 306 F.3d at 1072 (quotation marks and citation omitted), such mitigating evidence already is encompassed in his similar claim based on trial counsel's alleged failure to put forth mitigating evidence regarding severe mental illness at the time of the murders. To the extent that Turner argues that evidence of mental retardation is by itself a mitigating

ineffective for failing to present the mitigating affidavits and other information contained in Turner's seventy-eight exhibit Appendix submitted in his state and federal post-conviction proceedings.[22]

Turner's arguments in this regard fail for two reasons. First, as extensively recounted above, there was a wealth of mitigating evidence presented to the jury and the sentencing judge during the penalty and guilt phases of the trial, and the trial court specifically instructed the jury to consider this evidence in determining mitigating factors.[23] The trial court stated to the jury that its "advisory sentence

factor, the most important evidence in his Appendix was presented at trial. Specifically, during the penalty phase, trial counsel introduced Turner's school records, including the fact that he has scored 72 on an IQ test, and Dr. Miller testified that Turner was of "borderline intelligence." The new evidence in the Appendix is lay testimony, mostly through family members' affidavits, stating, for example, that Turner was "slow to learn," "was not very bright," and "wasn't quite right." Given Dr. Miller's testimony and that trial counsel presented Turner's actual school records, we conclude that trial counsel's performance clearly did not rise to the level of ineffectiveness regarding this fifth area.

[22]To the extent Turner argues that trial counsel was ineffective in failing to secure more time to locate this additional mitigating evidence, we conclude that trial counsel was not ineffective. First, trial counsel moved for a continuance prior to the sentencing hearing before the jury. We cannot fault trial counsel for attempting to secure more time, only to be denied by the trial court. Second, as recounted earlier, trial counsel actually was able to submit further mitigating evidence and arguments to the trial court more than a month after the initial sentencing hearing in front of the jury on August 23, 1985, but before the trial court sentenced Turner on November 1, 1985. Thus, trial counsel, in effect, obtained additional time to gather mitigating evidence and to submit it to the trial court.

[23]In reviewing the evidence available to the jury and trial judge prior to sentencing, we consider all of the evidence available, not just the evidence Turner's counsel specifically introduced. Also, the jury instructions told the jury to consider the evidence it had heard, not just that the defense had presented. We recognize that some of the mitigating evidence regarding Turner's mental state and Vietnam experience discussed herein came from the State's psychiatric expert testimony. Nevertheless, not to consider such evidence in the context of this ineffective assistance claim would have the effect of requiring significant repetition of testimony at trial. Furthermore, to the extent we rely on the psychiatric expert testimony as mitigating evidence, we

63

should be based upon the evidence that you have heard while trying the guilt or innocence of the defendant and the evidence that has been presented to you in these [sentencing] proceedings." More importantly, we agree with the district court that the additional information contained in Turner's Appendix is largely cumulative to the mitigating evidence recounted above, which the jury and the trial court considered during Turner's sentencing. We now discuss specifically each of the four main areas about which Turner complains.[24] By sparing no expense in our foundational discussion of the trial evidence above, the analysis of Turner's ineffective assistance claim that follows is relatively succinct.

As outlined earlier, with respect to Turner's mental illness, Dr. Stinson and Dr. Barnard each testified at trial regarding Turner's mental state at the time of the murders, and Dr. Miller testified twice, once at trial and once during the penalty phase. As detailed above, each of these expert witnesses specifically addressed

note that Turner's trial counsel attached all three psychiatrist reports, including the State's psychiatric expert's reports, to his memorandum in aid of sentencing filed on October 3, 1985, prior to the final sentencing hearing on November 1, 1985.

[24]Although Turner's Appendix focuses on these four mitigating factors, the Appendix also contains information regarding Turner's deeply-held religious convictions, his alleged drug and alcohol problems that began in Vietnam, his remorse for his actions, his difficult childhood and his parents' history of stress-related physical problems. Two of these areas, however, were addressed during trial (Turner's religious convictions and alcoholism in Vietnam). The other areas specifically were rebutted by other trial testimony (Turner informing Dr. Stinson that he "was without remorse" and would commit the murders again and that "his mother and father were everything parents should be"). Thus, to the extent that Turner argues that his trial counsel was ineffective in his treatment of these potentially mitigating matters, we conclude that the evidence is either cumulative or specifically rebutted by other trial testimony, and that Turner's trial counsel was not ineffective in this regard.

the severity of Turner's emotional state leading up to and during the murders. Dr. Miller, in fact, testified during the penalty phase that Turner's mental state met the standard for "extreme mental or emotional disturbance" and substantial impairment of the capacity to appreciate the criminality of conduct. See Fla. Stat. § 921.141(6)(b), (f) (1983). The State called no witnesses to rebut Dr. Miller's testimony during the penalty phase. While the record does not reflect the jury's specific findings on these two mental mitigation factors, it is clear in the record that the trial judge specifically rejected each of them.[25]

With respect to Turner's service in the Armed Forces during Vietnam, there likewise was substantial evidence presented during both the guilt and penalty phases of the trial. During the guilt phase, Dr. Stinson, Dr. Miller, and Dr. Barnard each testified that Turner had been in the Air Force in Vietnam and had engaged in varying degrees of combat situations, including seeing other soldiers wounded or killed. Furthermore, during the penalty phase, a photograph of Turner in the Air Force, his enlistment papers, a marksmanship medal, and his honorable discharge all were admitted into evidence. Turner's father also testified that Turner had served in Vietnam and discussed the military awards that Turner had

---

[25]The trial judge specifically stated that "[t]he assertion that the defendant was under the influence of extreme mental or emotional disturbance is specifically rejected as a mitigating circumstance," and that "the Court specifically reject[ed] the contention that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."

earned. Given this abundance of evidence, it also is important to note that the trial court did not discount Turner's Vietnam service due to a lack of evidence. Rather, the trial court determined that Turner's Vietnam service was almost twenty years prior to the murders and too remote in time to act as persuasive mitigating evidence: "The Court finds this factor to exist, but must consider the fact that the defendant was discharged in 1968." Thus, the additional information in the Appendix about Turner's service in Vietnam is largely cumulative.

As detailed earlier, Turner's trial counsel also presented to the jury considerable evidence of Turner's exemplary citizenship. Turner's coworker, Mark Ballard, testified about Turner's daring rescue of a woman who was abducted and raped while Turner was working for the Florida DOT. In connection with testimony regarding Turner's heroism, letters of commendation from the Secretary of the Florida DOT and a member of the Florida House of Representatives were admitted into evidence, along with newspaper clippings and a heroism medal awarded by the Florida DOT. Ballard's affidavit, filed in the Appendix, does allege that he could have testified to more heroic acts by Turner if someone only had asked him. Such allegations, however, are exactly the type of ex post musings cautioned against in Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (en banc) ("The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified

66

is not a sufficient ground to prove ineffectiveness of counsel.") (quotation marks and citation omitted). Again, based on the trial evidence recounted earlier, the state trial court concluded that Turner had "in the past demonstrated concern for others and unselfishness" but refused to find it significant in terms of mitigation given the gravity of the murders in issue.

Similarly, Turner argues that the affidavits of a jail counselor and jail nurse contained in his Appendix are indicia of readily available testimony regarding his exemplary prison conduct and potential for rehabilitation. While jail personnel did not testify on Turner's behalf at trial, there was testimony during the penalty phase from Turner's brother, Gregory, stating that Turner continued his devoted religious practices while incarcerated and that Turner was "a positive influence on him[self] and other inmates in his block." Thus, the jury and trial court were not unaware of Turner's prison conduct.

Furthermore, in ultimately determining Turner's sentence, the trial judge had the additional benefit of three memoranda written and filed by Turner's trial counsel. As detailed at length earlier, trial counsel's memoranda specifically addressed Turner's "extreme mental or emotional disturbance," and placed Turner's mental state in the context of his marital discord and family problems. Trial counsel's memoranda also recited extensive facts regarding (1) Turner's exemplary employment history, (2) his family upbringing and its influence on

Turner's life and behavior, (3) Turner's service in Vietnam, focusing especially on Turner's personal choice to enlist in the Air Force, and (4) Turner's meritorious conduct as a concerned citizen. Attached to one of the memoranda were a number of exhibits containing further mitigating evidence, including the full reports of all three psychiatrists–both State and defense experts–who testified at trial. Thus, Turner's trial counsel made the trial judge aware of most, if not all, of the forms of mitigating evidence contained in Turner's Appendix–not only during the trial evidence but also in supplemental memoranda during sentencing.

In sum, after careful comparison of the trial record and the exhibits in Turner's Appendix, we conclude that the district court correctly found that the vast majority of the evidence contained in the Appendix to Turner's § 2254 petition is cumulative to the evidence that was presented at trial and considered by the jury and state trial court at sentencing.

Second, the mere fact that Turner has submitted seventy-eight exhibits of additional information does not prove ineffective assistance of counsel. "In reviewing counsel's performance, a court must avoid using the distorting effects of hindsight and must evaluate the reasonableness of counsel's performance from counsel's perspective at the time." Chandler, 218 F.3d at 1316 (quotation marks and citation omitted). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of

counsel was unreasonable." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. "It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called, or . . . had they been asked the right questions." Waters, 46 F.3d at 1513-14. The existence of such mitigating affidavits, however, is of little significance because they usually establish "at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel." Id. at 1514. "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Id. (quotation marks and citation omitted); see also Chandler, 218 F.3d at 1316 n.20. Thus, the presence of fifty-two largely cumulative affidavits in the Appendix (forty-four of the seventy-eight exhibits) lends little, if any, support to Turner's ineffective assistance of counsel claim.

Because Turner has not shown that his counsel's "performance was deficient," we need not reach the prejudice prong of Strickland. 466 U.S. at 687, 697, 104 S. Ct. at 2064, 2069. We conclude that Turner's trial counsel during the

penalty phase was not ineffective and that, therefore, Turner's Sixth Amendment right to counsel was not violated.

## IV. RING CLAIM

Based on Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002), Turner asserts that Florida's capital sentencing structure, under which he was sentenced, violates his constitutional right to a jury trial under the Sixth Amendment. In Ring, the United States Supreme Court determined that Arizona's capital sentencing structure, which "allow[ed] a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty," violated the Sixth Amendment. 536 U.S. at 609, 122 S. Ct. at 2443. In so ruling, the Supreme Court effectively extended its holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), to capital cases, concluding that "[c]apital defendants, no less than non-capital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." Ring, 536 U.S. at 589, 122 S. Ct. at 2432.

Under Florida's capital sentencing structure, a jury renders an advisory verdict recommending life in prison or death to the trial judge, and subsequently the trial judge makes findings and determines the actual sentence. The Florida Supreme Court has stated that a "trial judge . . . is not bound by the jury's recommendation, and is given final authority to determine the appropriate

70

sentence." Engle v. State, 438 So. 2d 803, 813 (Fla. 1983). Accordingly, Turner argues that Ring and Florida's capital sentencing procedure are irreconcilable and that his judge-imposed death sentence violates his right to a jury trial under the Sixth Amendment.[26] We do not reach the underlying merits of Turner's constitutional claim, however, because (1) Turner is procedurally barred from bringing a Ring claim for the first time in this § 2254 appeal and, alternatively, (2) Ring does not apply retroactively to Turner. We first discuss why Turner's Ring claim is procedurally barred.

## A. Procedural Bar

In his state court proceedings, Turner never claimed that Florida's capital sentencing structure violated his Sixth Amendment right to a trial by jury. Thus, Turner is procedurally barred from bringing a Sixth Amendment claim under Ring in this § 2254 proceeding. "A state habeas corpus petitioner who fails to raise his federal claims properly in state court is procedurally barred from pursuing the same claim in federal court absent a showing of cause for and actual prejudice from the default." Bailey v. Nagle, 172 F.3d 1299, 1302 (11th Cir. 1999); see Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir. 1998) ("[W]hen it is obvious

---

[26]In addressing this same issue, the Florida Supreme Court has determined that Ring did not reach the constitutional validity of Florida's capital sentencing structure. King v. Moore, 831 So. 2d 143, 144 (Fla. 2002) ("[T]he United States Supreme Court has repeatedly reviewed and upheld Florida's capital sentencing statute over the past quarter of a century and although [the petitioner] contends that there now are areas of 'irreconcilable conflict' in that precedent, the Court in Ring did not address this issue.")

that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief.").

Procedural default arises when "the petitioner simply never raised a claim in state court, and it is obvious that the unexhausted claim would now be procedurally barred due to a state-law procedural default." Bailey, 172 F.3d at 1303; see 28 U.S.C. § 2254(b)(1)(A) (1994) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."). "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." O'Sullivan v. Boerckel, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731 (1999). This exhaustion doctrine "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." Id. at 845, 119 S. Ct. at 1732.

The record clearly shows that Turner never raised a Sixth Amendment right to a jury trial claim in the Florida courts. None of Turner's twelve claims on direct appeal, sixteen claims in the Rule 3.850 appeal, and three claims in his state

habeas petition mention, much less substantively address, a violation of Turner's Sixth Amendment right to a jury trial. While Turner drew the attention of the Florida appellate courts to myriad issues, including the necessity of special verdict forms at the guilt and penalty phases of trial, Turner did not argue that his Sixth Amendment rights were violated or that the Florida Supreme Court should depart from Hildwin v. Florida, 490 U.S. 638, 109 S. Ct. 2055 (1989), or the other United States Supreme Court decisions upholding Florida's capital sentencing procedures.[27]

Turner's "[f]ailure to raise [this] claim[] until now means that [he] deprived the state courts of 'the first opportunity to hear the claim[] sought to be vindicated in a federal habeas proceeding.'" Bailey, 172 F.3d at 1305 (quoting Picard v. Connor, 404 U.S. 270, 276, 92 S. Ct. 509, 512 (1971). Accordingly, "we apply the familiar principle that federal courts may treat unexhausted claims as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile." Bailey, 172 F.3d at 1305. Here, at a minimum, Turner's failure to raise a Sixth Amendment argument in his first Rule 3.850 motion in the Florida courts bars him from raising the argument in a successive petition. See Mills v. Florida, 684 So. 2d 801, 804

---

[27] Indeed, at oral argument before this Court, Turner's counsel effectively conceded, as he must, that a Ring-like claim was not raised in the Florida court proceedings.

n.3 (Fla. 1996); <u>Spaziano v. State</u>, 545 So. 2d 843, 844 (Fla. 1989) ("Unless petitioner shows justification for failure to raise the present issue in the first petition, the second successive petition pursuant to Florida Rule of Criminal Procedure 3.850 may be dismissed as an abuse of procedure."); <u>see</u> <u>also</u> <u>Snowden</u>, 135 F.3d at 736 n.4.

A habeas petitioner, such as Turner, however, may escape the procedural default doctrine either through showing "cause for the default and prejudice" or establishing a "fundamental miscarriage of justice." <u>Bailey</u>, 172 F.3d at 1306 (quotation marks and citation omitted). Turner makes neither showing. Although <u>Ring</u> was decided several years subsequent to the termination of Turner's state post-conviction proceedings, he was free, prior to <u>Ring</u>, to make a federal constitutional challenge to Florida's capital sentencing structure in the state courts but failed to do so.

"If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid." <u>Engle v. Isaac</u>, 456 U.S. 107, 130, 102 S. Ct. 1558, 1573 (1982) (internal footnote omitted). Indeed, despite their apparent futility, there have been numerous unsuccessful Sixth Amendment challenges to Florida's

74

capital sentencing structure in the last twenty years. See, e.g., Hildwin v. State, 531 So. 2d 124, 129 (Fla. 1988) (concluding petitioner's claim that "the death penalty was unconstitutionally imposed because the jury did not consider the elements that statutorily define the crimes for which the death penalty may be imposed" was without merit); Spaziano v. State, 433 So. 2d 508, 511 (Fla. 1983) (concluding that judge's consideration of evidence not before the jury in deciding to sentence convicted murder to death over jury's recommendation of life in prison was not improper); see also Barclay v. Florida, 463 U.S. 939, 103 S. Ct. 3418 (1983) (upholding Florida capital sentencing structure). Turner, like other Florida death row inmates both before and after him, could have brought a Sixth Amendment challenge to Florida's capital sentencing laws in state court but did not do so.

Furthermore, to the extent that Turner argues that he cannot be held to have forfeited his claim because settled law pre-Ring did not provide a legal basis for the claim, see e.g., Barclay, 463 U.S. 939, 103 S. Ct. 3418 (upholding Florida's capital sentencing structure), we disagree. The United States Supreme Court has held that "cause" to excuse a procedural default may exist "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel." Reed v. Ross, 468 U.S. 1, 16, 104 S. Ct. 2901, 2910 (1984). However, where an argument is not novel, and the "Federal Reporters [are] replete with cases

involving [similar] challenges," the default is not excused. Bousley v. United States, 523 U.S. 614, 622-23, 118 S. Ct. 1604, 1611 (1998). As discussed above, there have been repeated constitutional challenges to Florida's capital sentencing structure. Turner's Sixth Amendment or Ring claim is not novel, and, therefore, he cannot show the "cause" required to overcome the procedural bar to bringing the claim in this case.

Consequently, Turner has not shown the requisite cause to excuse his procedural default. Furthermore, Turner has not established a "fundamental miscarriage of justice" as this exception occurs only in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent and therefore is not "eligible for the death penalty." Sawyer v. Whitley, 505 U.S. 333, 340-41, 347, 112 S. Ct. 2514, 2519-20, 2523 (1992). Thus, we conclude that Turner is procedurally barred from bringing a Sixth Amendment claim based on Ring in this § 2254 appeal.

## B. Teague's Non-Retroactivity Standard

Alternatively, if Turner is not procedurally barred from bringing a Ring claim, Ring does not apply retroactively to Turner's § 2254 petition in any event. In Teague v. Lane, the United States Supreme Court held that there is no retroactive application in a habeas proceeding of any new constitutional rule of criminal procedure that had not been announced at the time the defendant's

conviction became final, with two narrow exceptions.[28]  489 U.S. 288, 310-313,

109 S. Ct. 1060, 1075-77 (1989); McCoy v. United States, 266 F.3d 1245, 1255

(11th Cir. 2001).  "A new rule should be applied retroactively only if it (1) 'places

certain kinds of primary private individual conduct beyond the power of the

criminal law-making authority to proscribe,' or (2) 'requires the observance of

those procedures that . . . are implicit in the concept of ordered liberty.'"  McCoy,

266 F.3d at 1255 (quoting Teague, 489 U.S. at 307, 109 S. Ct. 1060).

Whether the Teague doctrine bars Turner's Ring claim is a matter of first

impression in this circuit.  Two state supreme courts have applied the basic Teague

framework in their own case law and have determined that Ring does not apply

retroactively.  State v. Towery, 64 P.3d 828, 835 (Ariz. 2003) ("The new rule of

criminal procedure announced in Ring . . . does not meet either of the exceptions

to Teague's general rule that new rules do not apply retroactively to cases that

have become final."); Colwell v. State, 59 P.3d 463, 470-73 (Nev. 2002) (adopting

a Teague-based retroactivity test and concluding that "retroactive application of

Ring on collateral review is not warranted").[29]

---

[28]In contrast, new rules of substantive criminal law are applied retroactively.  Bousley v. United States, 523 U.S. 614, 620, 118 S. Ct. 1060 (1998) (limiting Teague's retroactivity standard to changes in procedural rules).

[29]While essentially utilizing the Teague framework, both the Arizona and Nevada Supreme Courts made it abundantly clear that, in their view, the United States Supreme Court strictly applies Teague in practice, and that those courts were not adopting Teague wholesale but adopting a less strict application of Teague.  Towery, 64 P.3d at 835 (noting that Arizona also

In a similar vein, and more importantly, this Circuit has held that <u>Apprendi</u>, on which <u>Ring</u> is based, announced a new rule of criminal procedure and does not apply retroactively on collateral review. <u>McCoy</u>, 266 F.3d at 1258. In <u>Apprendi</u>, the Supreme Court concluded that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S. Ct. at 2362-63. Post-<u>Apprendi</u>, this Circuit in <u>McCoy</u> applied <u>Teague</u>'s non-retroactivity doctrine and concluded (1) that <u>Apprendi</u> announced a new rule of criminal procedure and (2) that the rule announced in <u>Apprendi</u> did not meet either of the two exceptions contained in <u>Teague</u>. <u>McCoy</u>, 266 F.3d at 1256-57. For the reasons outlined below, we conclude that <u>McCoy</u>'s retroactivity analysis of <u>Apprendi</u> applies equally to <u>Ring</u>, and that, under the <u>Teague</u> doctrine, <u>Ring</u> does not apply retroactively to Turner's death sentence.[30]

_____

follows the balancing test in <u>Allen v. Hardy</u>, 478 U.S. 255, 106 S. Ct. 2878 (1986), to determine whether a new rule applies retroactively); <u>Colwell</u>, 59 P.3d at 471 (adopting "the general framework" of <u>Teague</u> and stating that "[t]hough we consider the approach to retroactivity set forth in <u>Teague</u> to be sound in principle, the Supreme Court has applied it so strictly in practice that decisions defining a constitutional safeguard rarely merit application on collateral review . . . . [W]e choose not to bind quite so severely our own discretion in deciding retroactivity"). Even under these more lenient retroactivity standards, both the Arizona and Nevada Supreme Courts determined that <u>Ring</u> does not apply retroactively on collateral review. <u>Towery</u>, 64 P.3d at 836; <u>Colwell</u>, 59 P.3d 473.

[30]This appeal is Turner's first § 2254 petition filed in 1993 prior to AEDPA. The Tenth Circuit has concluded that <u>Ring</u> does not apply retroactively, but in the context of successive habeas petitions governed by AEDPA. <u>See</u> <u>Cannon v. Mullin</u>, 297 F.3d 989, 992-94 (10th Cir. 2002) (concluding that petitioner was entitled "to file a second section 2254 habeas petition only if <u>Ring</u> set forth a new rule of constitutional law that was previously unavailable and the

## 1. New Rule of Criminal Procedure

According to Teague, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government [or] . . . if the result was not dictated by precedent existing at the time the defendant's conviction became final."  489 U.S. at 301, 109 S. Ct. at 1070.  Although Ring is essentially an application of Apprendi to the capital sentencing context, Ring, 536 U.S. at 609, 122 S. Ct. at 2443, Ring meets the "new rule" standard articulated in Teague.  We first explain why Ring is a rule of criminal procedure and then why Ring satisfies Teague's "new rule" standard.

Just as Apprendi "constitutes a procedural rule because it dictates what fact-finding procedure must be employed," United States v. Sanders, 247 F.3d 139, 147 (4th Cir. 2001), cited with approval in McCoy, 266 F.3d at 1256, Ring constitutes a procedural rule because it dictates what fact-finding procedure must be employed in a capital sentencing hearing.  Ring, 536 U.S. at 609, 122 S. Ct. at 2443.  Ring changed neither the underlying conduct the state must prove to

---

Supreme Court has made that new rule retroactive to cases on collateral review" and citing 28 U.S.C. § 2244(b)(2)(A)); see also In re Johnson, __F.3d __, 2003 WL 21321459, *1 n.1 (5th Cir. 2003) (questioning whether defendant's claims based on Ring are available to him on federal collateral review under Teague, but ultimately not reaching the issue); cf. Moore v. Kinney, 320 F.3d 767, 771 n.3 (8th Cir. 2003) (en banc) (citing AEDPA, and particularly 28 U.S.C. § 2244(b)(2)(A), and noting that "[t]he Supreme Court did not, and has not, expressly made the ruling in Ring retroactive" and "[a]bsent an express pronouncement on retroactivity from the Supreme Court, the rule from Ring is not retroactive").

establish a defendant's crime warrants death nor the state's burden of proof. <u>Ring</u> affected neither the facts necessary to establish Florida's aggravating factors nor that State's burden to establish those factors beyond a reasonable doubt. Instead, <u>Ring</u> altered only <u>who</u> decides whether any aggravating circumstances exist and, thus, altered only the fact-finding procedure.

Our conclusion that <u>Ring</u> announces a procedural rule is bolstered by <u>Ring</u>'s status as an extension of <u>Apprendi</u>. We agree with other courts who have concluded that because <u>Apprendi</u> was a procedural rule, it axiomatically follows that <u>Ring</u> is also a procedural rule. As the Arizona Supreme Court aptly has stated: "Logic dictates that if <u>Apprendi</u> announced a procedural rule, then, by extension, <u>Ring</u> . . . did also." <u>Towery</u>, 64 P.3d at 832-33 (also similarly noting that "<u>Ring</u> . . . extends <u>Apprendi</u>'s interpretation of the Sixth Amendment to the capital context"); <u>cf.</u> <u>Cannon v. Mullin</u>, 297 F.3d 989, 994 (10th Cir. 2002) (concluding, in the context of a successive habeas petition, that "[i]t is clear . . . that <u>Ring</u> is simply an extension of <u>Apprendi</u> to the death penalty context").[31]

[31]The Supreme Court specifically described <u>Apprendi</u>, on which <u>Ring</u> is based, as a procedural decision: "The substantive basis for New Jersey's enhancement is thus not at issue; the adequacy of New Jersey's <u>procedure</u> is." <u>Apprendi</u>, 530 U.S. at 475, 120 S. Ct. at 2354 (emphasis added). Numerous courts addressing <u>Apprendi</u>'s retroactive application consistently conclude that <u>Apprendi</u> announced a procedural rule. <u>See, e.g.,</u> <u>McCoy</u>, 266 F.3d at 1256 (listing cases); <u>Towery</u>, 64 P.3d at 832-33 (same).

Further, Ring breaks new ground because it expressly overruled, in part, Walton v. Arizona, 497 U.S. 639, 110 S. Ct. 3047 (1990).[32]  Ring established a new rule of criminal procedure, one that was not dictated by precedent existing before the Ring decision was released.  See McCoy, 266 F.3d at 1256.  Apprendi may have been a harbinger for the partial demise of Walton and the constitutional validity of judge-imposed death sentences.  Nonetheless, prior to the outcome in Ring, courts had been upholding judge-imposed death sentences in Walton and its progeny.  See, e.g., State v. Landrigan, 859 P.2d 111, 116 (Ariz. 1993); State v. Pizzuto, 810 P.2d 680, 707 (Idaho 1991), overruled on other grounds by State v. Card, 825 P.2d 1081, 1088 (Idaho 1991).  The constitutionality of judge-imposed death sentences was accepted in state and federal courts.  Thus, under Teague, because Ring's new rule had not been announced at the time Turner's convictions and sentences became final, Ring does not apply retroactively to his § 2254 petition unless it meets one of the two narrow exceptions in Teague.

## 2.  Exceptions to Teague's Non-Retroactivity Standard

The first type of rules excepted from Teague's non-retroactivity requirement is that which places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority."  Teague, 489 U.S. at 307, 109 S.

---

[32]In Walton, the Supreme Court rejected defendant Walton's argument that the Sixth Amendment demands that a jury, rather than a judge, find the presence of aggravating circumstances and upheld Arizona's capital sentencing statute, the same statute at issue in Ring. Walton, 497 U.S. at 649, 110 S. Ct. at 3055.

Ct. at 1073 (quotation marks and citation omitted). We conclude that Ring clearly does not implicate this first exception. Similar to Apprendi, Ring does "not decriminalize any class of conduct or prohibit a certain category of punishment for a class of defendants." McCoy, 266 F.3d at 1256-57.

The second type of rules excepted from Teague's non-retroactivity requirement is that which "requires the observance of those procedures that are implicit in the concept of ordered liberty." Teague, 489 U.S. at 307, 109 S. Ct. at 1073 (quotation marks, citation, and ellipsis omitted). "Such 'watershed' rules of criminal procedure are those in which (1) a failure to adopt the new rule 'creates an impermissibly large risk that the innocent will be convicted,' and (2) 'the procedure at issue . . . implicate[s] the fundamental fairness of the trial.'" McCoy, 266 F.3d at 1257 (quoting Teague, 489 U.S. at 312, 109 S. Ct. at 1076).

To fall under this second Teague exception, a new rule "must meet two requirements: Infringement of the rule must seriously diminish the likelihood of obtaining an accurate conviction, and the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." Tyler v. Cain, 533 U.S. 656, 665, 121 S. Ct. 2478, 2484 (2001) (quotation marks and citations omitted); see United States v. Swindall, 107 F.3d 831, 835 (11th Cir. 1997) (noting that a new rule must "not only improve accuracy [of trial], but also alter our understanding of the bedrock procedural elements essential to the

fairness of a proceeding " to meet <u>Teague</u>'s second exception) (quotation marks and citation omitted). The United States Supreme Court repeatedly has emphasized the narrowness of <u>Teague</u>'s second exception. <u>Sawyer v. Smith</u>, 497 U.S. 227, 243, 110 S. Ct. 2822, 2832 (1990) ("[I]t is 'unlikely that many such components of basic due process have yet to emerge.'") (quoting <u>Teague</u>, 489 U.S. at 313, 109 S. Ct. at 1077); <u>see also</u> <u>McCoy</u>, 266 F.3d at 1257 (stating that the "Supreme Court has underscored the narrowness of this second [<u>Teague</u>] exception"); <u>Spaziano v. Singletary</u>, 36 F.3d 1028, 1042-43 (11th Cir. 1994) (stating that a new rule fitting the second exception "must be so fundamentally important that its announcement is a 'groundbreaking occurrence'") (citation omitted).

We conclude that <u>Ring</u>, like <u>Apprendi</u>, "is not sufficiently fundamental to fall within <u>Teague</u>'s second exception." <u>McCoy</u>, 266 F.3d at 1257 (listing other circuits concluding <u>Apprendi</u> does not fall under <u>Teague</u>'s second exception); <u>Towery</u>, 64 P.3d at 835 (concluding that <u>Ring</u> is not a watershed rule that implicates the fundamental fairness of the trial and that <u>Ring</u> "does not meet either of the exceptions" in <u>Teague</u>); <u>Colwell</u>, 59 P.3d at 473 (concluding "the likelihood of an accurate sentence was not seriously diminished simply because a three-judge panel, rather than a jury, found the aggravating circumstances that supported

Colwell's death sentence").[33]  Pre-Ring sentencing procedure does not diminish

the likelihood of a fair sentencing hearing; instead, Ring's new rule, at most,

would shift the fact-finding duties during Turner's penalty phase from (a) an

impartial judge after an advisory verdict by a jury to (b) an impartial jury alone.[34]

Ring is based on the Sixth Amendment right to a jury trial and not on a perceived,

much less documented, need to enhance accuracy or fairness of the fact-finding in

a capital sentencing context.  Ring simply does not fall within the ambit of the

second Teague exception.

Accordingly, the new constitutional rule announced by the United States

Supreme Court in Ring does not fall within either exception to Teague's non-

retroactivity standard.  Therefore, Ring, like Apprendi, does not apply

retroactively on collateral review in federal court in Turner's case because his

convictions and sentences became final before the Supreme Court announced

---

[33]See also United States v. Cotton, 535 U.S. 625, 632-33, 122 S. Ct. 1781, 1786 (2002) (holding an indictment's failure to include the quantity of drugs was an Apprendi error but it did not seriously affect fairness, integrity, or public reputation of judicial proceedings and thus did not rise to the level of plain error).

[34]Because we conclude that Ring does not apply retroactively to Turner's case, we today expressly do not reach the issue of whether Florida's capital sentencing structure, which includes a jury's advisory verdict followed by sentencing by the trial judge, would still pass constitutional muster under Ring.

Ring. Thus, Turner cannot collaterally challenge his convictions and sentences on the basis of a claimed Ring error.[35]

## V. CONCLUSION

For the reasons stated herein, we affirm the district court's denial of Turner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**AFFIRMED.**

---

[35]As Justice O'Connor observed in Ring, current death row inmates "having completed their direct appeals . . . will be barred from taking advantage of [Ring] on federal collateral review." Ring, 536 U.S. at 621, 122 S. Ct. 2449-50 (O'Connor, J., dissenting) (citing 28 U.S.C. §§ 2244(b)(2)(A), 2254(d)(1) and Teague, 489 U.S. 288, 109 S. Ct. 1060).